440 October 25, 2019 No. 21

IN THE OREGON TAX COURT
REGULAR DIVISION

LEVEL 3 COMMUNICATIONS, LLC,
*Plaintiff*,

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant*.

(TC 5236)

Plaintiff (taxpayer) sought a reduction in the real market value of its centrally assessed property. In its analysis under the income approach, taxpayer asserted that Defendant Department of Revenue (the department) overestimated future cash flows by including expected income from equipment that had not been acquired as of the assessment date. Taxpayer argued that the potential to acquire additional income-generating property was not "property" belonging to the company, but rather one of a dozen "investment attributes" inseparable from the company's stock and thus belonging to the company's shareholders. The court examined the text, context, and legislative history of the relevant statutes, which date in large part to 1909, and concluded that the legislature intended its definition of "property" to include even intangibles that could not be separated from the stock, such as a corporation's right to exist or a nontransferable franchise. After reviewing relevant cases, the court concluded that the legislature intended the potential for future revenue growth to be considered under the income approach, whether that potential derives from an assemblage of equipment, real property, customer relationships, and workforce in place; or from the ability of the company to attract merger partners and additional capital investment; or from a combination of those factors. Each party performed an analysis of value using the cost approach. The court rejected as unreliable the department's inclusion of amounts shown as "accounting goodwill" on taxpayer's financial statements, as those amounts reflect only residual values recorded upon acquisition of other entities and bear no necessary relation to the current value of any intangible property. The court assigned no weight to any cost approach. Only the department used the market approach, applying the stock and debt method as a proxy. Taxpayer rejected the stock and debt method based on its view that that method counts the value of stock attributes that are not "property"; taxpayer did not offer alternative computations. The court concluded that the values provided by the department's expert were valid. Taxpayer also challenged the department's change in the geographic scope of the "unit" of property—from taxpayer's property in North America to taxpayer's property worldwide. The court concluded that taxpayer did not show any abuse of the department's statutory discretion to choose the geographic area of the unit, and the court rejected taxpayer's other arguments against the change in unit based on statutory interpretation.

Trial was held April 4, 5, and 9 through 13, 2018.

Cynthia M. Fraser, Garvey Schubert Barer, PC, Portland, argued the cause for Plaintiff.

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue.

Decision rendered October 25, 2019.

**ROBERT T. MANICKE, Judge.**

## I.  INTRODUCTION

These consolidated property tax cases require the court to determine the real market value of centrally assessed property[1] for tax years 2014-15, 2015-16, and 2016-17. There are substantial legal issues of general application involving the definition of "property" subject to valuation and assessment, as well as complex factual issues particular to Plaintiff's business. The court held an eight-day trial that included fact and expert testimony, followed by extensive post-trial briefing. This opinion first states necessary background, then organizes its main legal and factual analysis around the three approaches to value on which the parties based their valuation materials. The court concludes with analysis of a related issue specific to tax year 2014-15 involving the scope of the unit of property subject to valuation.

## II.  BACKGROUND

During all of the tax years at issue, Plaintiff Level 3 Communications, LLC was a telecommunications company and internet service provider headquartered in Broomfield, Colorado, with property throughout North America, including Oregon. Plaintiff was a wholly owned subsidiary of Level 3 Communications, Inc., a publicly traded company with property in multiple countries.[2] Plaintiff and its cor-

---

[1]  For general background on Oregon's central assessment of communication companies and other businesses, *see Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 289-93, 337 P3d 768 (2014).

[2]  The court notes two points for ease of reference. First, although the opinion describes Plaintiff's ownership structure as background, the structure raises no significant issues for purposes of this case. Accordingly, this opinion at times uses the terms "corporation" and "company" interchangeably, consistent with the broad definition in ORS 308.505(8) of a person maintaining a centrally assessed business. Second, unless otherwise indicated, references to the Oregon Revised Statutes (ORS) are to the 2013 edition.

porate parent are hereafter referred to collectively as "taxpayer." Taxpayer does not contest that it was subject to central assessment as a company engaged in the "communication" business for purposes of ORS 308.515(1)(h) and ORS 308.505(3).

Taxpayer was a "facilities-based provider," which is a provider that generally owns or leases a substantial portion of the plant, property, and equipment necessary to provide its services. Taxpayer operated an optical fiber network and provided services such as local switching, local data transport, and carrier common line services for medium to large internet carriers in North America, Latin America, Europe, the Middle East, and Africa. Taxpayer also provided private line, transoceanic, and dark fiber services, as well as related professional services. These services included data transport through taxpayer's transatlantic cable system, that connects North America, Europe, and Latin America, as well as leased "bulk" capacity on other transoceanic cable systems. In addition, taxpayer offered local and enterprise voice services using Voice over Internet Protocol and traditional circuit switch-based technologies. Taxpayer's customers were primarily large businesses listed as Fortune 100 or Fortune 500 companies, government entities, and other telecommunication carriers. "Enterprise" customers used taxpayer's services for specific data transmission needs, while "wholesale" customers used taxpayer's services to support the telecommunications services they offered to their own customers. The court will cite additional facts below as needed.

Taxpayer argues for a reduction in the real market value (RMV) for each tax year at issue. In this court, a party bears the burden of proof to the extent that the party seeks "affirmative relief." *See* ORS 305.427. For both parties in this case, the benchmark to determine the extent of affirmative relief each party seeks is the RMV shown on the property tax roll. As the table below shows, not only does taxpayer seek a reduction compared to the roll RMVs, Defendant Department of Revenue (the department) seeks an increase compared to the roll RMVs, whether measured by the relatively modest increases derived by the department's expert

witness or by the very substantial increases alleged in the department's amended answers. Each party thus bears some burden of proof in comparison to the roll values. *See, e.g.*, *Ellison v. Clackamas County Assessor*, 22 OTR 201, 206 (2015) (each party bore burden of proving any favorable deviation from value shown on roll—in that case, as amended by order of county board of property tax appeals). See Table 1 on page 444.

For all three tax years, taxpayer contends that the department seeks an incorrectly high RMV by attempting to include in the "unit" for valuation purposes certain items that are not "property" within the meaning of the central assessment statutes. In addition, for the 2014-15 tax year only, taxpayer objects to the fact that the department in its original assessment defined the "unit" of property for valuation purposes as confined to North America, but at trial relied on an appraisal report that defined the unit as taxpayer's worldwide property. For the 2015-16 and 2016-17 tax years, the department consistently defined the unit as taxpayer's worldwide property both for purposes of its original assessment and at trial, and taxpayer did not object.

### III.   ISSUES

(1)   May the department and this court consider the value of taxpayer's centrally assessed business to be the value of taxpayer's property, barring a showing of specific factual differences?

(2)   For tax year 2014-15, may the department at trial rely on an appraisal that values a unit of property different from the unit the department valued when preparing the tax roll?

(3)   What was the real market value of taxpayer's property assessable in Oregon for tax years 2014-15, 2015-16, and 2016-17?

### IV.   ANALYSIS

Taxpayer summarizes the main issue in this case as follows: "The overriding error in each of the Department's valuations is that the Department's expert did not proffer

Table 1

| Tax Year | RMV—Parties' Positions (in thousands) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Tax Roll and Department's Original Answer | | Department's Trial Expert | | Department's Amended Answer | | Taxpayer's Trial Expert | |
| | System[3] | Oregon | System | Oregon | System | Oregon | System | Oregon |
| 2014-15 | None shown | $68,000 | $12,150,000 | $127,575 | $34,000,000 | $370,600 | $3,400,000 | $50,300 |
| 2015-16 | $16,000,000 | $174,500 | $16,650,000 | $184,815 | $34,000,000 | $442,000 | $8,000,000 | $86,800 |
| 2016-17 | $17,000,000 | $220,500 | $19,150,000 | $224,055 | $34,000,000 | $452,200 | $8,600,000 | $111,700 |

[3] The term "system" value commonly refers to the value of the overall unit of property. The Oregon RMV is derived by multiplying the "system" or unit value by the Oregon allocation factor. *See* OAR 150-308-0610. The parties do not disagree about the allocation factor.

and present evidence of value of the property of [taxpayer] valuations is that the department's expert did not proffer and present evidence of value of the property of [taxpayer] but instead performed a business enterprise valuation of the company." Taxpayer's arguments are based on the premise that taxpayer as a centrally assessed company is something distinct from the property it owns, holds or uses. Therefore, according to taxpayer, the department may not include in its determination of value any items that are attributes of taxpayer as a company. Because it claims the department has done just that, taxpayer asks the court to reject the department's valuations and accept taxpayer's conclusions of value. Except for the issue of the scope of the valuation unit for tax year 2014-15, the parties' disagreement is an all-or-nothing dispute over whether elements of value that taxpayer attributes to itself as a company may be treated as part of the value of the unit of property, an allocable portion of which is assessable and taxable by Oregon.

In the abstract, taxpayer's premise is logical. The ordinary meaning of "property" is "something that is or may be owned or possessed,"[4] which implies that the person owning or possessing the property can be identified separately and may have its own attributes or characteristics that make its value different from that of the property it holds. Taxpayer's argument, however, requires the court to probe specifically what the Oregon legislature intended in its definition and use of "property" in the central assessment statutes. The court organizes its analysis by following the three customary "approaches" to value: the income approach, the cost approach, and the market approach, as presented by the parties in their experts' written analyses and at trial. Within the discussion of each valuation approach, the court first analyzes whether and to what extent taxpayer's premise applies as a matter of Oregon law. The court then considers whether, as a fact matter, the department should have excluded the value of those items that taxpayer has identified as attributes of taxpayer as a company.

---

[4] Quoting *Webster's Third New Int'l Dictionary* at 1818 (unabridged ed 2002).

A.   *Income Approach (Discounted Cash Flow)*

The court starts with the income approach, on which both parties presented substantial evidence. "Generally speaking, the income approach measures the present value of the anticipated future stream of income attributable to the company's operating property, by discounting the company's anticipated cash flows to present value using a capitalization rate that reflects the company's costs of investment." *Delta Air Lines, Inc. v. Dept. of Rev.*, 328 Or 596, 603, 984 P2d 836 (1999). "Income approach theory assumes that an income-producing property is worth the present value of its future income stream. Mathematically under this approach, the value of a company is derived by use of the accounting formula, $V = I/R$. The 'I' in the formula is an estimated future income figure for the company. The 'R' is a capitalization rate that is divided into the income figure to obtain the value, 'V.'" *PP&L v. Dept. of Rev.*, 308 Or 49, 58, 775 P2d 303 (1989). Taxpayer relies on its income approach exclusively, except that taxpayer presented a cost approach to determine a "high benchmark" against which to check its income approach. The department relies most heavily on its income approach, places "significant" reliance on its market approach, and places the least reliance on its cost approach.

Within the income approach, the parties employ different methods. Taxpayer exclusively determines its value based on its computation of the discounted cash flow (DCF) that its property generated. The department uses the DCF method as well, but with assumptions and inputs that differ from those of taxpayer.[5] Because the DCF method is the only method that both parties use, the court begins with each party's analysis based on that method and the disagreements between them. The table below shows each party's asserted "system" value and "Oregon" value under the DCF method (with the overall roll values included for ready comparison). Because the parties do not disagree about the allocation formula, the court focuses on the system value.

---

[5] The department also uses the "constant growth yield capitalization" method and computes a value based on a "direct capitalization" method. The court addresses disputes about these methods below.

| Discounted Cash Flow (DCF) Method (System Value) | |
|---|---|
| **Taxpayer's Trial Expert** | |
| 2014-15 | $3,400,000,000 |
| 2015-16 | $8,000,000,000 |
| 2016-17 | $8,600,000,000 |
| **Department's Trial Expert** | |
| 2014-15 | $11,187,000,000 |
| 2015-16 | $14,534,000,000 |
| 2016-17 | $17,546,000,000 |

As is apparent, the difference between the parties' results under the DCF method is nearly 100 percent for tax years 2015-16 and 2016-17. For the 2014-15 tax year, the difference in the unit presumably contributes to the much greater overall value difference. The court addresses that difference at the end of this opinion. The court focuses first on the following differences that are common to each year and do not appear to be tied to selection of the unit.

The DCF method starts by estimating future cash flows after all expenses, investment in working capital, and capital expenditures are made. The cash flows are discounted at a rate that reflects the return an investor would expect, given the level of risk inherent in the investment.

1.  *Projected growth in revenues*

The major differences between the parties' conclusions of value based on the DCF method start with the forecast of cash flows. Taxpayer's principal expert, Dr. Hal Heaton, generally predicted that gross revenue would decline significantly each year, while the department's expert, Brent Eyre, predicted steady revenue growth.[6] Taxpayer does not necessarily disagree with the department's projected growth rate for the company as a whole, but taxpayer argues that its forecast is premised on valuing only the property in existence on the assessment date for each tax year, and

---

[6] The court omits here discussion of the experts' qualifications, which was the subject of the court's order on evidentiary objections, *Level 3 Communications, LLC v. Dept. of Rev.*, 23 OTR 87 (2018).

taxpayer claims that the department's forecast erroneously inflates revenue by including revenue from property that taxpayer would have had to acquire after the assessment date. Underlying taxpayer's forecast is its factual position that customer demand for increased broadband capacity increased dramatically in each tax year, forcing taxpayer to buy and install large amounts of new, additional equipment each year, or to acquire other telecommunications companies that have additional equipment. Meanwhile, taxpayer asserts that constant technological advancements allowed equipment to furnish ever-greater capacity at an ever-lower cost per unit of capacity, rapidly rendering the equipment in place on any assessment date obsolete. An item installed and operating on January 1, 2014, might have a fraction of the capacity of an item that taxpayer could buy some months later for the same price, and taxpayer would be compelled to make that subsequent purchase in order to meet the substantial increase in customer demand that would occur during those same months. Taxpayer's fact witnesses provided thorough and well-organized testimony supporting all of these contentions; the court finds the testimony and related documentary evidence highly persuasive.

Just as taxpayer does not seriously dispute the department's growth predictions for taxpayer as a company, the department does not refute taxpayer's factual evidence showing that taxpayer's equipment declines rapidly in value. The department nevertheless contends that growth in revenue is properly attributable to the property in place on the assessment date, citing this court's opinion in *United Telephone Co. v. Dept. of Rev.*, 10 OTR 333, 340-41 (1986), *modified*, 307 Or 428, 770 P2d 43 (1989). The court regards this disagreement as raising a legal issue, the first in a series that reduce to the question whether Oregon law allows the value of a centrally assessed company's property to be determined by reference to the value of the company itself.

2.  *Taxpayer's contention regarding investment attributes*

Taxpayer's expert Heaton testified that the department overestimated future cash flows by counting revenues that the department expects taxpayer will generate

from property it has not yet acquired as of the assessment date. Taxpayer's expert witness in rebuttal, Robert Reilly, described the potential to acquire additional income-generating property as one of a dozen "investment attributes," *i.e.*, attributes inhering in the stock or other ownership interests of taxpayer as a legal entity. Taxpayer contends that these investment attributes are not "property" that a company can use or hold, but instead are inseparable from the company's stock or other ownership interests. Because they cannot be separately identified apart from the company, valuing these attributes, according to taxpayer, would amount to valuing the company itself and not its property. Reilly listed these investment attributes in the following table:[7]

| Relationship of Unit Value and Business Value (from Plaintiff's Exhibit 48) | | | | |
|---|---|---|---|---|
| **Unit Value** | **+** | **Investment Attributes** | **=** | **Business Value** |
| Working Capital | | Future Tangible Property | | Value of Debt Securities |
| Tangible Property | | Future Intangible Property | | Value of Equity Securities |
| Intangible Property | | Present Value of Growth Opportunities | | |
| | | Potential Mergers and Acquisitions | | |
| | | Stock Liquidity | | |
| | | Investor Limited Liability | | |
| | | No Reinvestment Requirement | | |
| | | No Investor Bankruptcy Risk | | |
| | | Expected Appreciation (not Depreciation) | | |
| | | Small Dollar Amount Investments | | |
| | | Investment Diversification | | |
| | | Favorable Income Tax Treatment | | |

---

[7] The table essentially replicates Plaintiff's Exhibit 48, offered to show the department's alleged error.

For purposes of its legal analysis, the court (1) denominates taxpayer's list of twelve "investment attributes" as the "Attributes" and (2) initially assumes that the Attributes are, in fact, attributes of the stock or other ownership interests in the company. Based on that assumption, the court now analyzes whether Oregon law allows the department and this court to determine the RMV of taxpayer's property by reference to the value of taxpayer as a company, including the Attributes.

3.   *Statutory analysis*

The court looks to the legislature's statutory instructions to the department regarding how to determine the values to record on the central assessment roll. Key statutes, reprinted below, prescribe the department's duty to "make an annual assessment of any property that has a situs in this state" (ORS 308.515(1)); the definition of "property" that the department can value and assess (ORS 308.505(9)); data that centrally assessed companies are required to report to the department (ORS 308.520 to 308.525); and the instructions for determining the value of the relevant "unit" of property (ORS 308.545 to 308.555). Although most of the relevant statutory language has been in place since 1909,[8] the court has found no Oregon case that has squarely addressed the issue taxpayer raises. The court applies the approach prescribed in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), and considers the text, context, and legislative history of these statutes.[9]

---

[8] See below; *see generally Comcast*, 356 Or at 289-94.

[9] Only limited "legislative history" of the early central assessment laws exists, at least in the strict sense of the "record of a bill's progress from introduction to enactment," legislator statements, and materials demonstrably before legislators during the session, presumably due to the capitol building fire of 1935. Jack L. Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 697 (2019). The information preserved in the House Journals of 1909 and 1913, consisting mainly of amendments to the bill text and records of referrals to committees and votes, is of little use in this case. The court finds it significant, however, that the 1909 act creating the central assessment system adopted nearly verbatim the relevant text of bill proposals contained in a report that the legislature commissioned in 1905 and that was completed in 1906. *See* Report of the Board of Commissioners Appointed Under the Provisions of Chapter 90, Laws of 1905, for the Purpose of Examining and Reporting on Matters of Assessment and Taxation, etc. (June 30, 1905), *available at* https://archive.org/details/reportboardcomm00mulkgoog/page/n5 (accessed Oct 25, 2019) ("1906 Oregon Report"). The 1906 Oregon Report includes extensive analysis of the problems of Oregon's tax system and a

a. Text

The court begins with an analysis of the relevant text:

"308.505   Definitions for ORS 308.505 to 308.665. As used in ORS 308.505 to 308.665:

"* * * * *

"(8) 'Person,' 'company,' 'corporation' or 'association' means any person, group of persons, whether organized or unorganized, firm, joint stock company, association, cooperative or mutual organization, people's utility district, joint operating agency as defined in ORS 262.005, syndicate, entity formed to partner or combine public and private interests, partnership or corporation engaged in performing or maintaining any business or service or in selling any commodity as set forth in ORS 308.515, whether or not the activity is pursuant to any franchise and whether or not the person or other entity or combination of entities possesses characteristics of limited or unlimited liability.

"(9) 'Property':

"(a)   Means all property of any kind, whether real, personal, tangible or intangible, that is used or held by a company as owner, occupant, lessee or otherwise, for the performance or maintenance of a business or service or for the sale of a commodity, as described in ORS 308.515;

"(b)   Includes, but is not limited to, the lands and buildings, rights of way, roadbed, water powers, vehicles, cars, rolling stock, tracks, office furniture, telephone and transmission lines, poles, wires, conduits, switchboards, machinery, appliances, appurtenances, docks, watercraft irrespective of the place of registry or enrollment, merchandise, inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all other goods or chattels; and

"(c)   Does not include items of intangible property that represent:

discussion of how the bill proposals seek to address them. Whether categorized as legislative history or as context, the court views the 1906 Report as a valuable resource to shed light on the 1909 law. The Oregon State Archives houses original prints of the 1906 Report as part of its "Messages and Documents" compilation of materials from the 1909 legislative session, side by side with the chapter laws for that session.

"(A)   Claims on other property, including money at interest, bonds, notes, claims, demands or any other evidence of indebtedness, secured or unsecured; or

"(B)   Any shares of stock in corporations, joint stock companies or associations.

"(10)  'Property having situs in this state' means all property, real and personal, of a company, owned, leased, used, operated or occupied by it and situated wholly within this state, and, as determined under ORS 308.550 and 308.640, the proportion of the movable, transitory or migratory personal property owned, leased, used, operated or occupied by a company, including but not limited to watercraft, aircraft, rolling stock, vehicles and construction equipment, as is used partly within and partly outside of this state.

"* * * * *

"308.515   Department to make annual assessment of designated utilities and companies.

"(1)   The Department of Revenue shall make an annual assessment of any property that has a situs in this state and that, except as provided in subsection (3) of this section, is used or held for future use by any company in performing or maintaining any of the following businesses or services or in selling any of the following commodities, whether in domestic or interstate commerce or in any combination of domestic and interstate commerce, and whether mutually or for hire, sale or consumption by other persons:

"(a)   Railroad transportation;

"(b)   Railroad switching and terminal;

"(c)   Electric rail transportation;

"(d)   Private railcar transportation;

"(e)   Air transportation;

"(f)   Water transportation upon inland water of the State of Oregon;

"(g)   Air or railway express;

"(h)   Communication;

"(i)   Heating;

"(j)   Gas;

"(k)   Electricity;

"(L)   Pipeline;

"(m)   Toll bridge; or

"(n)   Private railcars of all companies not otherwise listed in this subsection, if the private railcars are rented, leased or used in railroad transportation for hire.

"* * * * *

"308.520   Companies to file statements.

"(1)   Each company shall make and file with the Department of Revenue, on or before February 1 of each year, in such form as the department may provide, a statement, under oath, made by the president, secretary, treasurer, superintendent or chief officer of the company, covering a period of at least one year, as may be required by the department; except that Class I railroads, Class A electric companies, communication companies, gas companies, large water transportation companies, pipeline companies, air transportation companies and private railcar companies shall file such statement on or before March 15 of each year.

"* * * * *

"308.525   Contents of statement. Each statement required by ORS 308.520 shall contain the following facts about the company:

"(1)   The name of the company, the nature of the business conducted by the company and the state or country under whose laws the company is organized.

"(2)   The location of the company's principal office.

"(3)   The name and address of the chief officer or managing agent or attorney in fact in Oregon.

"(4)   The number of shares of its capital stock authorized and issued.

"(5)   The par value and market value, or actual value if there is no market value, of each issued share of stock on January 1 at 1:00 a.m. of the year in which the report is made.

"(6)    The bonds and other corporate obligations owing by the company.

"(7)    The par value and market value, or actual value if there is no market value, of the bonds or other obligations owing by the company on January 1 at 1:00 a.m. of the year in which the report is made.

"(8)    A detailed statement of the real property owned by the company in Oregon on January 1 at 1:00 a.m. of the year in which the report is made, where situated, and the cost thereof.

"(9)    A detailed statement of the personal property owned by the company in Oregon on January 1 at 1:00 a.m. of the year in which the report is made, where situated, and the cost thereof.

"(10)    A statement showing the historical or original cost of all of the real property owned by the company as of January 1 at 1:00 a.m. of the year in which the report is made, whether situated within or without the state.

"(11)    A statement showing the historical or original cost of all of the personal property of the company as of January 1 at 1:00 a.m. of the year in which the report is made, whether situated within or without the state.

"(12)    A full and complete statement of the historical or original cost and book value of all buildings of every description owned by the company within the state.

"(13)    The total length of the company's lines or operational routes, the length of its lines or operational routes within the State of Oregon, and also the length of its lines or operational routes without the State of Oregon, including those which the company controls or uses as owner, lessee or otherwise.

"(14)    A statement of the number of wire, pipe, pole or operational miles, and miles of main and branch railroad lines, double track, spurs, yard tracks and sidetracks, owned or leased by the company in each county in this state, and each municipal subdivision thereof, stated separately.

"(15)    A statement in detail of the entire gross receipts and net earnings of the company from all sources, stated separately, for the fiscal year next preceding the date of the report.

"(16)   Any other facts or information the Department of Revenue requires in the form of return prescribed by it.

"* * * * *

"308.545   Mode of valuing property.

For the purpose of arriving at the amount and character and assessed value of the property belonging to a company, the Department of Revenue personally may inspect the property, and may take into consideration the statements filed under ORS 308.505 to 308.665, the reports, statements or returns of the company filed in the office of any board, office or commission of this state, or any county thereof, the earning power of the company, the franchises and special franchises owned or used by the company, and such other evidence of any kind that is obtainable bearing thereon. However, no report, statement or return shall be conclusive upon the department in arriving at the amount and character and assessed value of the property belonging to the company.

"308.550   Valuing property of company operating both within and without state.

"(1)   When a company owns, leases, operates over or uses rail, wire, pipe or pole lines, operational routes or property within and without this state, if the department values the entire property within and without this state as a unit, it may ascertain the property subject to taxation in Oregon by the proportion which the number of miles of rail, wire, pipe or pole lines or operational routes in Oregon, controlled or used by the company, as owner, lessee, or otherwise, bears to the entire mileage of rail, wire, pipe or pole lines or operational routes controlled or used by the company, as owner, lessee, or otherwise.

"(2)   If the value of any property having a situs in this state, of a company operating both within and without the state, cannot fairly be determined in the manner prescribed in subsection (1) of this section, the Department of Revenue may use any other reasonable method to determine the proper proportion of the entire property assessable for taxation in this state.

"* * * * *

"308.555   Unit valuation of property.

"The Department of Revenue, for the purpose of arriving at the assessed value of the property assessable by

it, may value the entire property, both within and without the State of Oregon, as a unit. If it values the entire property as a unit, either within or without the State of Oregon, or both, the department shall make deductions of the property of the company situated outside the state, and not connected directly with the business thereof, as may be just, to the end that the fair proportion of the property of the company in this state may be ascertained. If the department values the entire property within the State of Oregon as a unit, it shall make deductions of the property of the company situated in Oregon, and assessed by the county assessors, to an amount that shall be just. For that purpose the county assessors shall, if the department so requests, certify to the department the assessed value of the property of the companies assessable by them, but such certification of assessed value is intended to be advisory only and is not conclusive upon the department."

The court does not see within the text a clear answer to whether any of the Attributes are part of the "property" that the department is allowed to value as a unit. None of the Attributes is specifically named in the statutory definition of "property," but neither do the statutes expressly exclude them or prescribe whether the value of the valuation unit is equivalent to the value of the legal entity that owns the property. The legislature left undefined the key term "intangible property," as well as other terms, in particular, "franchise." *See* ORS 308.505(9)(c)(A)‑(B). The items of intangible property that the statute excludes from the definition of "property" are specific (items representing claims on other property and shares of stock), and taxpayer has not raised any issue regarding the treatment of any such items. *See id*. The plain meaning of "intangible property" is unenlightening. *Black's Law Dictionary* as published close in time to the 1909 and 1913 acts[10] defined the phrase "intangible property" as follows: "Used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes,

---

[10] *See Comcast*, 356 Or at 296 n 7 (stressing importance of consulting dictionary definitions contemporaneous with enactment of the statute).

and franchises." *Black's Law Dictionary* 643 (2d ed 1910).[11] From the statutory definition of "property," the court concludes that the legislature viewed a "franchise" as one type of intangible property, but the broad definition otherwise does not aid in determining whether the legislature considered any of the Attributes intangible property. A general dictionary definition from 1907 defined the word "franchise" as: "A particular privilege conferred by grant from a sovereign or a government, and vested in individuals; an immunity or exemption from ordinary jurisdiction; a constitutional or statutory right or privilege, esp. the right to vote." *Webster's Int'l Dictionary of the English Language* 592 (1907). *Black's*, however, distinguished two types of franchise: "The charter of a corporation is its 'general' franchise, while a 'special' franchise consists in any rights granted by the public to use property for a public use but with private profit." *See Black's Law Dictionary* 532 (2d ed 1910). The United States Supreme Court used the term "franchise to be" to refer to a "general" franchise, and "franchise to do" to refer to a "special" franchise. *See Adams Exp. Co. v. Ohio State Auditor*, 166 US 185, 224-25, 17 S Ct 604, 41 L Ed 965 (1897); *see also Portland v. Portland Gas & Coke Co.*, 80 Or 194, 201, 156 P 1070 (1916). Like the definition of "intangible property," however, the plain meanings of "franchise" and "special franchise" alone do not help the court determine whether the department can include the intangible attributes of shares of corporate stock when valuing the unit of property of the company.

Turning to the specific text of the unit valuation statutes, the court observes that ORS 308.545 expressly allows the department to consider the value of the company's stock and the amount of the company's income when valuing the company's property. The statute does this in two ways: by allowing the department to "take into consideration" the company's annual statement, which must report stock value, company income and other items (ORS

---

[11] Today's most commonly cited dictionary similarly defines "intangible property" without referring specifically to any of the attributes taxpayer describes (except goodwill): "property having no physical substance apparent to the senses : incorporeal property (as choses in action) often evidenced by documents (as stocks, bonds, notes, judgments, franchises) having no intrinsic value or by rights of action, easements, goodwill, trade secrets." *Webster's Third New Int'l Dictionary* 1173 (unabridged ed 2002).

308.525), and by expressly stating that the department may consider "the earning power of the company" as well as the "franchises and special franchises" owned or used by the company (ORS 308.545). The court views this authority to consider the stock value, the income, and the "earning power" of the company as strong factors tending to indicate that the legislature viewed the ability of the company as an entity to earn revenue as relevant to the value of the unit of company property. This text is not conclusive because the phrase "take into consideration" does not specify what weight the department may assign to the stock value and earning power of the company, and the text does not rule out the possibility of equating the two.

### b.   Context and legislative history

The court turns to the statutory context. As an initial matter, the court returns to the key terms "franchises and special franchises,"[12] which are the subject of much early case law, reflecting the central role that special franchises granted to private businesses played in the development of infrastructure in Oregon and other states.[13] Importantly for this case, contemporaneous court decisions show that both types of franchise generally were thought of as personal rights that were not transferable—or, in the case of special franchises, transferable only with the consent of the public body franchisor. One year before the legislature used the word "franchise" in its definition of "property" for central assessment purposes, the Oregon Supreme Court held

---

[12] Nontax statutes as of 1909 confirm that the legislature had an understanding of the term "franchise" that was consistent with its plain meaning. *See, e.g.*, *Lord's Oregon Laws*, title XLIII, ch I, § 6525 (1910) ("The use of the water of the lakes and running streams of the state of Oregon, for general rental, sale or distribution, for purposes of irrigation, and supplying water for household and domestic consumption, and watering live stock upon dry lands of the state, is a public use, and *the right to collect rates or compensation for such use, of said water is a franchise*." (Emphasis added.)).

[13] For a critical discussion of the numerous special railroad, streetcar, electrical and gas franchises in early twentieth-century Portland, see E. Kimbark MacColl, *The Shaping of a City: Business and Politics in Portland, Oregon 1885-1915* (1976). That work states that Portland granted 191 franchises from 1887 to 1914, 50 percent of which went to major railroads, and 43 percent of which went to the Portland Railway Light & Power Company, predecessor to Portland General Electric Company. *Id.* at 10; *see also Behnke-Walker v. Multnomah County*, 173 Or 510, 513, 146 P2d 614 (1944) (describing role of corporations formed by early "special" legislative grants).

that a state franchise to charge tolls for operating a canal and locks at Willamette Falls was not assignable, based on the terms of the original grant of rights. *Oregon v. Portland Gen. Elec. Co.*, 52 Or 502, 516, 521, 95 P 722, *reh'g den*, 52 Or 530, 98 P 160 (1908) ("But the construction and operation of a canal and locks as part of a navigable river, and the taking of tolls thereon are franchises that cannot be exercised without permission from the State. *** Again, as to the power of the first company to transfer its franchises, the grant was made to the first company with no power to transfer."). Similarly, an earlier United States Supreme Court decision applying Oregon law declined to find any "general power to sell or lease *** property or franchises" held by a railroad corporation to which the state had granted the right to operate within the city of Portland. *Oregon Ry. & Nav. Co. v. Oregonian Ry. Co.*, 130 US 1, 30-31, 9 S Ct 409, 32 L Ed 837 (1889). In each case, the respective court concluded that the legislature had not chosen to confer a right of transfer in the franchise act itself, and a doctrine of strict construction against the franchisee prevented the court from imputing a right of transfer. *See Portland Gen. Elec.*, 52 Or at 517; *Oregon Ry. & Nav. Co.*, 130 US at 26; *cf. Eldredge v. Mill Ditch Co.*, 90 Or 590, 594, 177 P 939 (1919) (citing "the franchise of corporations" as example of "Interests Which Cannot Be Transferred"). From this context, coupled with the dictionary definitions above, the court concludes that the 1909 Legislative Assembly understood a "franchise" as intangible property consisting of a set of rights that were, by default, not transferable. As will be seen, the legislature's choice to identify as taxable property an item that could not be separated from its corporate owner cuts against taxpayer's arguments regarding the Attributes.

Although integrated with the general property tax system of laws, the features of the central assessment laws relevant to this case are largely self-contained.[14] The

---

[14] Critically, the central assessment statutes use an independent definition of "property." *See* ORS 308.505(9); *cf.* ORS 307.020(1) (defining "personal property," "tangible personal property," and "intangible personal property"); ORS 307.020(2) (foregoing definitions do not apply to centrally assessed property); ORS 307.030 (excluding intangible personal property from regular, local, assessment but not from central assessment); *see also Southern Pacific Trans. Co. v. Dept. of Rev.*, 295 Or 47, 52, 664 P2d 401 (1983) (describing central assessment statutes

court therefore looks for further indications of legislative intent by examining the statutory development and historical context of the statutes reprinted above. The legislature created today's system of central assessment in 1909, by establishing the department's predecessor, the Board of State Tax Commissioners, and by delegating to it the task of determining the value of property used or held by railroad companies, telephone companies, and water, gas and electric companies, among others. Or Laws 1909, ch 218; *Lord's Oregon Laws*, title XXVII, ch VI, §§ 3614, 3617(15) (1910); *see generally Comcast*, 356 Or at 289-94. The 1909 law permitted the board to value the entire "unit" of property, and to then assign a portion of that overall unit value to the property located in Oregon and its local taxing jurisdictions, superseding the regular property tax laws that required each local assessor to attempt to determine the value of the particular length of track, wire or other property in that county. *See Lord's Oregon Laws*, title XXVII, ch VI, §§ 3622, 3623, 3626. However, as summarized in *Comcast*, central assessment did more than prevent a distortive amalgam of locally determined values:

> "Central assessment also allowed assessors to capture additional value inherent in certain property. In particular, central assessment made possible 'assessments which would reach those large intangible values, called franchise value or good will, which could not be effectively taxed by local assessors.'"

356 Or at 290 (quoting James C. Bonbright, 2 *The Valuation of Property*, 637 (1937)).

Oregon did not blaze the trail of central assessment. From 1854 until shortly before the 1909 enactment of central assessment, Oregon property tax law, though broadly written, did not expressly identify whether or how franchises and other intangible property could be assessed or valued. *Oregon v. Pacific States Tel. & Tel. Co.*, 53 Or 162, 166, 99 P 427 (1909) (As of 1906 "there was no law specifically requiring the franchise of a corporation to be

---

as a "complete and comprehensive *** scheme of assessment for taxation"); *but see, e.g.*, *Northwest Natural Gas Co. v. Dept. of Rev.*, 347 Or 536, 226 P3d 28 (2010) (certain exemptions apply to locally and centrally assessed property).

assessed, nor providing the manner of estimating the value thereof[.]"), *appeal dismissed*, 223 US 118, 32 S Ct 224, 56 L Ed 377 (1912). Meanwhile, other states responded to the growth of railroad, telegraph, telephone, and other increasingly large and far-flung enterprises by adopting various forms of unitary valuation, typically combined with centralized assessment by a single statewide body. A wave of litigation followed nationwide. Some of the laws, or judicial decisions interpreting them, addressed whether the value of the unit was equivalent to that of the company. *See* Bonbright, 1 *Valuation of Property* at 522-34 (surveying early New York cases starting in 1834).

The United States Supreme Court's 1875 opinion known as the *State Railroad Tax Cases* was groundbreaking at the federal level. *See Taylor v. Secor*, 92 US 575, 2 Otto 575, 23 L Ed 663 (1875). Those consolidated cases involved Illinois' 1872 act that expressly listed "[t]he capital stock of companies and associations incorporated under the laws of this state," along with real property and other personal property, as property to be assessed and taxed. *See* An act for the assessment of property, and for the levy and collection of taxes, approved 30 March 1872[,] In force 1 July 1872, ch 89, § 436, compiled in E.L. & W.L. Gross, *The Statutes of Illinois: An Analytical Digest of All the General Laws of the State in Force at the Present Time: Official and Standard, by Act of the Legislature*: *1818 to 1872*, Vol. II, 336 (Springfield: E.L. & W.L. Gross, 1872). The same act also created a state board to determine the value of "[t]he capital stock of all companies \*\*\* including the franchise, over and above the assessed value of the tangible property of such company or association." *Id.* §§ 438-39. To implement the law, the state board adopted a rule prescribing the method to determine the value of the "capital stock":[15]

---

[15] As will be seen, the Illinois statute, like others at the time, generally used the phrase "capital stock" to mean money or property contributed to the corporation by its shareholders, including any property that the corporation had acquired using that money or property. By contrast, "*shares of* stock" or "*shares of* capital stock" referred to the shares held by the shareholders. *Compare id.* § 436(2) ("shares of stock" taxable to resident individuals), *with* § 443 ("capital stock" and franchises taxed to corporation at locality of corporation's principal office or location where corporation does business). *See Henderson Bridge Co. v. Kentucky,* 31 SW 486, 17 Ky L Rptr 389 (1895), *aff'd*, 166 US 150, 17 S Ct 532, 41 L Ed 953 (1897) (discussed below).

"'The *market or fair cash value* of the *shares of capital stock*, and the market or fair cash value of the debt (excluding from such debt the indebtedness for current expenses), shall be combined or added together; and the aggregate amount so ascertained shall be taken and held to be the fair cash value of the capital stock, including the franchise, respectively, of such companies and associations.'"

*Taylor*, 92 US at 604 (quoting board of equalization rule (emphases added)). The rule then required the value of tangible property to be deducted from the aggregate value of the shares and the debt, and the resulting difference "shall be taken and held to be the fair cash value of the capital stock, including the franchise \*\*\*." *Id*. The Court summarized this residual approach, stating plainly that the starting point is the value of the company's shares in the hands of its shareholders, plus debt:

"It is therefore obvious, that, when you have ascertained the current cash value of the whole funded debt, and the current cash value of the entire number of shares, you have, by the action of those who above all others can best estimate it, ascertained the true value of the [rail]road, all its property, its capital stock, and its franchises; for these are all represented by the value of its bonded debt and of the shares of its capital stock."

*Id*. at 605. Like taxpayer in this case, the taxpayers in the *State Railroad Tax Cases* argued that the Illinois law invalidly valued rights inherent in the stock. The Court summarized the taxpayers' argument as follows:

"that the capital stock and capital of a corporation are distinct and different; that the capital stock belongs to the stockholders, and cannot be assessed against the corporation, but said act requires not only the capital of corporations to be assessed, but their capital stock to be assessed to the corporation in addition thereto \*\*\*."

*Id*. at 589. The Court briefly acknowledged the distinction, *see id*. at 602-03, but upheld the tax despite this and many other objections, rejecting the taxpayers' attempt to distinguish the value of the total shares held by shareholders, plus corporate debt, from the value of the unit of property that the corporation holds, including such intangible property as the corporation's "capital stock" and the corporate "franchise."

Twenty years later, a similar argument arose in what became known as the *Adams Express* cases, involving Ohio's central assessment of express, telephone and telegraph companies. *Adams Exp. Co. v. Ohio State Auditor*, 166 US 185, 17 S Ct 604, 41 L Ed 965 (1897). An 1893 act directed the state central assessing authority to "be guided by" the value of the "entire capital stock" when determining the value of an express company's property in the state. An Act to Amend and Supplement Sections 2777, 2778, 2779, and 2780 of the Revised Statutes of Ohio, 1893 vol. 90 at 330, 332.[16] In a state-court mandamus action leading up to the United States Supreme Court's opinion, the central assessment authority sued a local county auditor to compel him to assess and collect property tax on the centrally determined value. The county auditor refused, arguing that the act invalidly inflated the value of an express company's tangible personal property by attributing to the property value that is properly attributable to the company itself:

> "But it is contended in behalf of the defendant that *not only was the property of the National Express Company valued* by a special board, after a special method, but that its property was not assessed at its true value in money, because the value of the capital stock was taken as a guide, thereby, in contravention of the constitution, *adding to the intrinsic value of the tangible property in this state a value inherent in the capital stock, and due to the franchise, good will, and business of the company*, and the value of its property in other states.

> "＊＊＊＊＊

> "It is contended that when the value of the shares of the capital stock of a corporation is augmented through the franchise, good will, and successful management of the business of the concern, such value should not avail to add to the true value in money of the tangible property of the corporation for the purpose of taxation."

---

[16] The Ohio act defined an express company as any person "engaged in the business of conveying to, from or through this state, or any part thereof, money, packages, gold, silver, plate or other article, by express, not including the ordinary lines of transportation o**f** merchandise and property in this state ＊＊＊." *Id.* at 330.

*State ex rel. Poe v. Jones*, 51 Ohio St. 492, 509-511, 37 NE 945 (1894) (emphases added). The Ohio Supreme Court rejected these arguments, and the United States Supreme Court quoted the Ohio opinion extensively in its own opinion upholding the Ohio law on Commerce Clause grounds:

> "'The market value of property is what it will bring when sold as such property is ordinarily sold in the community where it is situated; and the fact that it is its market value cannot be questioned because attributed somewhat to good will, franchise, skillful management of the property, or any other legitimate agency.'"

*Sanford v. Poe*, 165 US 194, 224-25, 17 S Ct 305, 41 L Ed 683 (1897) (quoting 51 Ohio St. at 512).[17]

At the same time as the Ohio *Adams Express* cases, a unit valuation case arising in Kentucky prompted the Kentucky appellate court to discuss in depth the conceptual basis for using the value of the total shares to determine the value of a corporation's franchise. *Henderson Bridge Co. v. Kentucky*, 31 SW 486, 17 Ky L Rptr 389 (1895), *aff'd*, 166 US 150, 17 S Ct 532, 41 L Ed 953 (1897). The case involved property tax as applied to the operator of a railroad bridge spanning the Ohio river between Kentucky and Indiana. *Id*. Kentucky had imposed a tax of 42.5 cents per $100 of value on all real and personal property, later adding a specific provision imposing the tax on any franchise of a corporation or other person engaged in a specified business (railroad, electric power, telephone, etc.). *Former* Ky. Gen. Stat. §§ 4019 (rate and general imposition), 4022 (definition of assessable property), 4077 (extending the tax to the franchise of any corporation holding one), 4082 (treating franchises held by persons other than corporations similarly). Although the statute was framed as a tax on property of the corporation, the statutory method for valuing the franchise first required

---

[17] Six weeks after issuing its decision entitled *Sanford v. Poe*, the United States Supreme Court issued its opinion entitled *Adams Exp. Co. v. Ohio State Auditor*, 166 US 185, 17 S Ct 604, 41 L Ed 965 (1897), in response both to a petition for rehearing in *Sanford v. Poe* and in a case involving Indiana law. The *Adams Express* opinion does not change the result in *Sanford v. Poe* but discusses more specifically states' power to include the value of franchises and other intangible property in the value of other property for property taxation purposes. In *Adams Express* the Court also commented on its opinion in *Henderson Bridge Co. v. Kentucky*, as discussed below.

the taxing authority to "fix the value of the capital stock of the corporation," and then to "deduct the assessed value of all tangible property * * *." *Former* Ky. Gen. Stat. §§ 4079. Similar to the Illinois railroad tax, the Kentucky statute thus determined the value of the franchise as a residual amount: the difference between the value of the "capital stock" and the value of the real and tangible personal property. *Id.* at 489 ("The remainder thus found shall be the value of its corporate franchise subject to taxation as aforesaid.").

The *Henderson Bridge* court discussed at length the meaning of the phrase "capital stock of the corporation," positing that it might refer either to (a) only what might be called today the cash constituting the paid-in capital contributed by investors; or (b) all of the tangible and intangible property of the corporation, including the paid-in capital, the corporation's "surplus," and its franchise. 31 SW at 489-91. The court accepted the broader definition, drawing on a line of earlier New York cases. In doing so, the Kentucky court equated the broader definition (b) to the shares of stock in the hands of the shareholders. *Id.* at 489 ("'The share of stock covers, embraces, and represents all three [paid-in capital, surplus, and franchise] in their totality, for it is a business photograph of all the corporate possessions and possibilities. * * * [W]hile th[e New York] court describes the shares of stock owned by the several individual members of the corporation as representing in interest and value all these things, yet the same things all combined constitute and are the property of the corporation or company.'" (Quoting *People v. Coleman*, 27 NE 818, 126 NY 433 (1891).)); *cf. Revenue Cabinet v. Comcast Cablevision of the South*, 147 SW 3d 743, 745-46 (Ky 2003) (applying *Henderson Bridge* in concluding that the proper starting point to determine the value of the taxable franchise was the "business enterprise value," *i.e.*, "the price at which a willing buyer and a willing seller would buy an entire business as of the date," including "future values associated with future investment and future property acquisition").

On review, the United States Supreme Court opinion laid out this valuation procedure with little comment and otherwise concerned itself with the taxpayer's Commerce Clause claim, which the Court rejected on narrow factual

grounds—the Court concluded that the taxpayer did not conduct interstate business; only the persons crossing the bridge and paying tolls did so. *Henderson Bridge*, 166 US at 153-54.[18] In the *Adams Express* reconsideration opinion, however, the Court referred to the facts of *Henderson Bridge*, apparently accepting that the value of the shareholders' stock equaled the value of the entire property of the corporation. *See Adams Express*, 166 US at 220 (describing *Henderson Bridge* facts as "The owners, therefore, of that stock, had property which, for purposes of income and purposes of sale, was worth $2,900,000. What gives this excess of value? Obviously, the franchises, the privileges the company possesses, its intangible property."); *see also id.* at 221-23 (positing generally that "the corporate property" of an express company is worth the same amount as the aggregate shares of stock in the hands of the shareholders, except to the extent the company shows it holds property not used in the business, such as shares of stock in other corporations).

By the turn of the twentieth century, therefore, a robust public record was in place consisting of statutes of other states that purported to value on a unitary basis such intangible items as the "franchise," or the "capital stock," in addition to the real property and other personal property, of railroad, telephone, and other companies; as well as opinions of the United States Supreme Court and the courts of other states on how to determine the value of such intangible items. Prominent court opinions acknowledged the distinction between the unit of property belonging to a corporation and the shares in that corporation belonging to the shareholders. Yet the courts approved valuing the franchise or capital stock by a residual method that used as the starting point the value of the total shares held by the shareholders and that then subtracted the separately determined value of tangible personal property and real property, ultimately

---

[18] In a 1981 opinion dissenting from denial of *certiorari*, Justice Byron White stated that, although *Henderson Bridge* remained good law, it would likely be upheld under modern theories of apportionment, rather than on the basis that the taxpayer's activity did not constitute interstate commerce. *Newell Bridge & Railway Co. v. Dailey*, 451 US 942, 944-45, 101 S Ct 2026, 68 L Ed 2d 331 (1981) (White, J., dissenting).

treating the value of the company and the value of the company's total property as one and the same.

Against this backdrop of reported cases from other states, the court now reexamines for further context the relevant developments in Oregon in the years leading up to 1909. By the late 1800s, Oregon assessors had begun to incorporate elements of the unit valuation concept, including reference to the value of the shares of company stock, into the valuation of railroad and telephone companies. Although Oregon property tax law did not refer specifically to franchises until 1907, the definition of "real property" expansively included land, structures, and fixtures, as well as "all rights and privileges belonging or in any wise appertaining thereto," and "personal property" was defined to include "goods" and "chattels," as well as "moneys," debts, shares in corporations, and "such portion of the capital of incorporated companies liable to taxation on their capital as shall not be invested in real estate." General Laws of Oregon, Civ Code, ch LIII, title I, §§ 2-3, p 893-94 (Deady 1845-1864); The Codes and Statutes of Oregon, title XXX, ch I, § 3038, and ch III, § 3057 (Bellinger & Cotton 1901). In at least one instance, a local assessor sought to include the value of a railroad's franchise in the value of its "roadbed." *See O. & C. R. R. Co. v. Jackson County*, 38 Or 589, 605, 65 P 307, *modified on recons*, 38 Or 589, 65 P 369 (1901) (*O. & C. Railroad*).[19] On appeal, the Oregon Supreme Court rejected the assessor's value as arbitrary, in part because the assessor had relied heavily on per-mile values that the California state board of equalization had determined for the portion of the company's roadbeds located across the border in California. *Id.* at 615. The court noted that California law prescribed a substantially different method of assessment, including an express requirement to assess the franchise, as well as a rule that assigned higher values to portions of the track nearer to population centers. *Id.* at 615-16. Having concluded that the assessor's valuation was not grounded in fact, the court determined what appears to be a unit value,

---

[19] The assessor purported to assess the company's "roadbed and franchise." *O. & C. Railroad*, 38 Or at 611. Although the local board of equalization ordered all reference to the franchise to be stricken from the roll, the board made no change to the value that the assessor had determined. *Id.* at 613.

apportioned by mile, based on trial evidence, relying primarily on the "net earnings" per mile of road and testing the result against the replacement cost and the "market value of the bonds and stock of the company." *Id.* at 621-22. As to the market value of the stock and bonds, the court noted:

> "So, too, the value of stocks and bonds may furnish an element by which to determine the worth of such property. The conditions which may unite to influence the market must be borne in mind, as they may be unnatural, and out of the usual course; *but the criterion is one that may be legitimately resorted to in determining the value of the property which they represent.*"

*Id.* at 608 (emphasis added);[20] *see also Pacific States Tel. & Tel. Co.*, 53 Or at 166 (discussed below) (telephone company contended that the value of its franchise had been included for property tax purposes). This court concludes that, even before the legislature made franchises or other intangible rights expressly taxable, the Oregon Supreme Court implicitly included their value when measuring the value of other property and, more importantly for this case, looked to the value of shares of stock and bonds of the corporation as an indicator of the property's value.

Between the 1901 *O. & C. Railroad* case and the 1909 enactment of central assessment, four significant Oregon law changes occurred that affected the taxation of intangible items. First, in 1903, the legislature imposed an annual fee on all corporations for the privilege of doing business in Oregon, ranging from $10 to $200, depending on the "amount of its authorized capital stock." Or Laws 1903 at 39, 43-44 (HB 2). Variously described as a tax or as a fee, this charge burdened a corporation's right to exist as a legal entity—the "general" franchise or "franchise to be." The "franchise to be" a corporation obviously is a nontransferable right personal to each corporation; the court concludes that in that

---

[20] This favorable reference to use of the value of stocks and bonds is notable because the court cited as support two federal circuit court opinions that sharply criticized reference to the value of the corporation's shares as liable to be inaccurate because the share value includes goodwill. *O. & C. Railroad*, 38 Or at 608 (citing *Railroad & Telephone Companies v. Board of Equalizers of Tennessee*, 85 F 302, 313-14 (1897); *Cotting v. Kansas City Stock-Yards Co.*, 82 F 850 (C.C.D. Kan. 1897), *rev'd sub nom*, *Cotting v. Godard*, 183 US 79, 22 S Ct 30, 46 L Ed 92 (1901).

respect it is analogous to an intangible Attribute described by taxpayer in this case. Further discussion of this 1903 annual registration charge appears below.

Second, in 1905, the legislature, apparently responding to longstanding complaints of "unequal taxation" and failure to capture the taxable value of railroad franchises, express company goodwill, and patent rights, among other items,[21] directed the formation of a one-year bipartisan commission "for the purpose of examining and reporting upon the matters of assessment and taxation of property in this State, the collection of revenue in taxes, and the framing of laws upon that subject, to be submitted to the Legislative Assembly of this State at its next regular session." Or Laws 1905, ch 90, § 1. The duty of the commissioners included "mak[ing] a tax code for the State of Oregon *** includ[ing] a complete system of the just and equitable assessment and taxation of all forms of property, both tangible and intangible ***." *Id.* § 4. The 1905 act required the Governor and Secretary of State to print 5,000 copies of the report and the commission's proposed laws and to distribute them to all legislators and newspapers, and to county clerks. *Id.* § 11.

On June 30, 1906, the three lawyers appointed to the commission delivered their 300-page report, recommendations, and draft bills. The 1906 Oregon Report covered a great deal of ground,[22] but the treatment of franchises and other intangible property was a major point of detailed discussion. Throughout the report, including a 10-page appendix, the commission expressed its views about how the value of a franchise should be determined.

---

[21] *See* "Assessor C.P. Strain on 'Invisible Values,'" *East Oregonian* pp 3-4 (Dec 3, 1904) (reprinting circular letter from Umatilla County assessor to the legislature complaining that the state loses "$200,000 per annum by a failure to reach the franchise of railroads and express companies" and proposing a temporary commission to provide guidance to assessors); *see also* James Wilkinson Chapman, *State Tax Commissions in the United States*, 522-24 (Johns Hopkins, 1897) (describing earlier Oregon commissions of 1885 and 1890 that publicly raised similar concerns), *available at* https://books.google.com.nf/books?id=ZOAYAAAAYAAJ&printsec=copyright#v=onepage&q&f=false (accessed Sept 9, 2019).

[22] Topics included Oregon's restrictive Uniformity Clauses and longstanding statutes that made state finances ostensibly dependent on ad valorem property taxes but pitted counties against each other, leading to widely acknowledged undervaluation by elected local assessors.

These portions included original research but also drew heavily from two sources: the Oregon Supreme Court's 1901 opinion in *O. & C. Railroad*, and a nationwide analysis, as of 1904, of railroad valuation conducted by the US Census Bureau, later published in a bulletin of the US Department of Commerce and Labor. *See* Department of Commerce & Labor, Bureau of the Census, *Commercial Valuation of Railway Operating Property in the United States: 1904*, Bulletin 21 (1906), *available at* https://books.google.com/books?id=Xp5WOMZO0MkC&pg=PA7&lpg=PA7&dq=Commercial+Valuation+of+Railway+Operating+Property+in+the+United+States:+1904&source=bl&ots=Yh-QEG6jk5i&sig=ACfU3U1hvI8X3QairYzKv1DguHilCngybQ&hl=en&sa=X&ved=2ahUKEwjWwvbo6sTkAhWUtZ-4KHfGwBfIQ6AEwA3oECAMQAQ#v=onepage&q=Commercial%20Valuation%20of%20Railway%20Operating%20Property%20in%20the%20United%20States%3A%201904&f=false (last accessed Sept 19, 2019) ("1904 Census Bureau Report").

The Oregon commission and its sources generally agreed on the extent to which the value of the shares of stock of a railroad company is useful as an indicator of the value of the company's property. As quoted above, the Oregon Supreme Court viewed the value of the shares as a legitimate source of information. *O. & C. Railroad,* 38 Or at 608. The main problems identified are that (1) railroad companies tend to invest in what now is called "non-operating property," property used in unrelated lines of business, such as hotels, mines, etc. (or in shares of stock in companies that operate nonrailroad businesses);[23] and (2) the sale of all of the shares of stock in a railroad company is rare, and the sources expressed uncertainty about reliance on the prices of a few shares sold in thin trading, or on the price for only a controlling interest.[24] Those problems are not at issue in

---

[23] *See* 1904 Census Bureau Report at 9, 17 (discussing inadequacy of a pure "stock and debt" method in separating income from nonrailroad properties such as hotels, as well as income from other railroad companies that already are assessed in their own right), cited in 1906 Oregon Report at 193.

[24] 1906 Oregon Report at 194 ("To the extent that the purchase of railway securities is not the purchase of the whole property, but merely of an undivided interest therein, and that the price paid for an undivided interest is not a sure criterion of what the price would have been for the purchase of the property as a

this case, and nothing in the 1906 Oregon Report raises the concerns that taxpayer raises here, that using the aggregate value of the shares as a proxy for the value of the tangible and intangible property that the company owns might incorrectly incorporate Attributes that reside in the shares but not in the company's property. The portions of the 1909 law that are relevant to this case incorporate nearly verbatim the draft bills in the 1906 Oregon Report.

The third major legislative development preceding the 1909 act occurred several weeks before the Oregon commission completed the 1906 Oregon Report, on June 4, 1906, when the voters used the newly adopted right of the citizens' initiative to pass two short-lived laws imposing "license" charges on telephone companies and companies operating certain other of the types of businesses that would later be centrally assessed. Or Laws 1907, chs 1 - 2; *see* Official Voters' Pamphlets, General Election, June 4, 1906.[25] The two 1906 "license" laws imposed a tax of either two percent or three percent on the company's annual "gross receipts" or "gross earnings," depending on the type of business. A company was subject to the telephone company tax "when engaged" in the subject business. Or Laws 1907, ch 1, § 3. Except for basic identifying information, the gross receipts were the only data that the company was required to supply under either tax.

The Pacific States Telephone and Telegraph Company immediately, but unsuccessfully, challenged the 1906 gross receipts tax on a number of grounds, including "double taxation," on the theory that the company's franchise was already subject to tax under the 1903 general registration charge act and under the property tax laws. *Pacific States Tel. & Tel. Co.*, 53 Or at 166. The Oregon Supreme

---

unit, the values ascertained in the report, by the second method, are too high."); *but see* 1904 Census Bureau Report at 19 ("The method of valuing railway properties on the basis of the market quotations of their stocks and bonds is regarded by many as the most defensible of all methods, for the reason that the price of railway securities established on the stock exchanges is the resultant of a combination of the greatest possible number of judgments.").

[25] The Voters' Pamphlets were titled, "To Propose An Act Requiring Sleeping Car Companies, Refrigerator Car Companies, And Oil Companies to Pay An Annual License Upon Gross Earnings"; and "To Propose An Act Requiring Express Companies, Telegraph Companies, And Telephone Companies to Pay An Annual License Upon Gross Earnings." *Id*.

Court[26] rejected the company's argument as to the 1903 general registration charge, describing the 1903 charge as imposed "on the right to be or exercise the powers of a corporation," *i.e.*, a general right to exist, while the 1906 gross receipts tax was "a tax on the business or franchise which the corporation, *when organized*, may exercise," *i.e.*, a franchise "to do" or "special" franchise. *Id.* at 164-65. As to the company's claim that its property tax assessment had "include[ed] the value of its franchise," the court declared that no law as of 1906 specifically required the franchise of a corporation to be assessed, noting that "clearly a law on the subject [of franchise taxation] regularly enacted could not be rendered nugatory or invalid by local assessors including in the value of corporate property their estimate of the value of the franchise." *Id.* at 166. In other words, the court again acknowledged that pre-1907 law may have allowed local assessors to include the value of a corporate franchise when assessing other property, but the court saw no impermissible "double taxation" in also allowing the state to impose a gross receipts tax on a percentage of the entire earnings from operation of a telephone business. *Id.*

Finally, while the state and federal appeals of the 1906 "license" laws were pending in *Pacific States Telephone*, the 1907 Oregon legislature enacted another property tax law change, which Wells Fargo and other companies argued impliedly repealed the 1906 gross receipts tax laws. *See State of Oregon v. Wells, Fargo & Co.*, 64 Or 421, 126 P 611 (1913) (*Wells Fargo*). The 1907 law added "franchise" to the items listed in the definition of "land, real estate and real property" for property tax purposes, thus expanding the property tax base to include franchises "to do." Or Laws 1907, ch 268, § 2.[27] But this law expressly excluded from the definition of real property "the right to be a corporation," avoiding the

---

[26] The United States Supreme Court's subsequent review of *Pacific States Tel. & Tel.* was limited to whether the initiative provisions violated the United States Constitution's guarantee of a republican form of government. *See* US Const Art IV, § 4. The Court dismissed the appeal on the ground that the issue was nonjusticiable. *See Kiernan v. City of Portland*, 223 US 151, 32 S Ct 151, 56 L Ed 380 (1912).

[27] For noncentrally assessed property, the term "franchise" continued to be listed as one item in the definition of "land," "real estate," and "real property" until 1935. *Compare* OCA § 69-102 *with* Or Laws 1935, ch 274, § 2.

possibility that the new definition would impose a "double tax" on the franchise "to be." Wells Fargo also argued that the 1909 central assessment law itself, which left the 1907 definition of real property unchanged for property that was locally assessed, impliedly repealed the 1906 gross receipts taxes by adding *both* "franchise" and "special franchise" to the definition of "property" for centrally assessed taxpayers.[28] *See Wells Fargo*, 64 Or at 424; *see generally Portland v. Portland Ry., L. & P. Co.*, 80 Or 271, 293, 156 P 1058 (1916) (noting this difference).

The Oregon Supreme Court agreed with Wells Fargo that the 1909 central assessment provisions impliedly repealed the 1906 gross receipts taxes because the 1909 and 1906 tax laws covered the same ground. *See Wells Fargo*, 64 Or at 432 ("[T]he act of 1909 * * * covers the whole field of taxation embraced in the [gross receipts tax] act of 1906 * * *. It covers the same ground, deals with the same subject, and was, no doubt, intended to be a complete and comprehensive scheme of taxation, * * * taking the place of previous laws for the assessment and taxation of express, telephone, and telegraph companies; and therefore repeals such previous statutes by implication.")[29] Turning to the instant case, an argument could be made that, because the gross receipts taxes were imposed on the entire income of the subject companies (at least to the extent of their engagement in the subject business), the implied replacement of those taxes with a property tax base that includes the value of a general and special franchise suggests legislative approval of valuing the entire

---

[28] The 1909 law ambiguously included "franchises" and "special franchises" in the definition of "property" subject to assessment while also providing that, for purposes of valuing the unit,

"said franchises and special franchises [are] not to be directly assessed, but [are] to be taken into consideration in determining the value of the other property * * *."

Or Laws 1909, ch 218, §§ 5, 9; *see Portland v. Portland Ry., L. & P. Co.*, 80 Or 271, 294-95, 156 P 1058 (1916) ("if it can be said that the franchise is assessed at all"). In 1941, the legislature resolved this ambiguity as to whether franchises could be assessed vs. merely used as a valuation tool, deleting the quoted phrase from what is now ORS 308.545 while retaining the reference to franchises and special franchises in the definition of "property" in what is now ORS 308.505(14)(b) (2017). *See* Or Laws 1941, ch 440, § 14.

[29] The court declined to reach whether the 1907 change to the definition of real property, which remained in place for noncentrally assessed taxpayers, impliedly repealed the 1906 gross receipts taxes. *See id*. at 432.

subject enterprise for property tax purposes. This court does not reach that argument, as the opinion in *Wells Fargo* is brief and says nothing about whether the 1909 legislature intended to value the property of a company engaged in a centrally assessed business by the value of the business and the company as a whole, or whether it intended to limit the valuation of intangible property to only defined items belonging to the corporation as a separate entity. This court draws no particular conclusion from the implied repeal of the 1906 gross receipts taxes by the 1909 central assessment statutes.

Keeping in mind these Oregon developments that closely preceded the 1909 act, the court now reviews the 1909 central assessment provisions anew. The court finds the 1909 definition of "property" remarkable for its emphatic breadth, using the phrase "all property," or variants thereof, a total of three times. The definition immediately declares that "property" includes "all property, real and personal," belonging to or held by the company. The definition goes on to list a number of specific items, but again adds "and all other property of a like or different kind" used in the business, as well as "all other real and personal property," finally adding "and all franchises and special franchises" before concluding with the proviso that excludes certain property not used in the centrally assessed business. Or Laws 1909, ch 218, § 5.[30] Based on this repeated intention to include "all" property, the court concludes that the legislature intended "property" and its constituent terms, such as "franchise," to be interpreted expansively. As to the specific issue taxpayer has raised, the legislature is considered to have known, from the opinions in *State Railroad Tax Cases, Adams Express, Henderson Bridge,* and others noted above, that the United

---

[30] The full definition, less the proviso, read:

"The term 'property,' as used in this act, shall be deemed to include *all property*, real and personal, subject to assessment for taxation under this act belonging to the corporation, or held by it as occupant, lessee, or otherwise, and shall include the rights of way, roadbed, cars, rolling-stock, tracks, wagons, horses, office furniture, telegraph, telephone and transmission poles, wires, conduits, switchboards, machinery, appliances, appurtenances, *and all other property of a like or different kind*, used in the carrying on of the business of said corporation, and owned, leased, or operated by them respectively, *and all other real and personal property*, *and all franchises and special franchises* * * *."

Or Laws 1909, ch 218, § 5 (emphases added).

States Constitution would allow Oregon to treat the value of all shares in a company as equivalent to the value of the entirety of a corporation's tangible and intangible property. The legislature would have been aware that the Oregon Supreme Court eight years previously had endorsed a valuation method that primarily used the net earnings of the company, and also commented favorably on using the value of shares of company stock and debt, assuming that an adequate market existed for the shares of stock and that property not used in the unit could be excluded. The legislature's own commission had issued a similar endorsement in an extensive report from June 1906 that urged the legislature to adopt specific bill language to enable a new, permanent state board of tax commissioners to consider corporate share prices and corporate earnings. The 1909 legislature enacted the commission's proposed language nearly verbatim. The 1909 act expressly allowed the new board of tax commissioners to take into account not only the value of any "special" franchise but also the corporation's very right to exist (the "general" franchise). The former was generally considered an intangible right inseparable from the company itself, and the latter clearly was. On the basis of this context, the court concludes that, despite the important differences for many purposes between the property held or used by the corporation and shares held by the shareholders, the legislature in 1909 intended to authorize the department's predecessor to treat the value of the total shares as equivalent to the value of the unit of corporate property for property tax purposes, at least absent some factual reason not to do so.[31]

c.   Post-1909 statutory development

The court now reviews whether the legislature intended any of its later amendments to the 1909 law to

---

[31] This conclusion assumes away certain potential factual complexities, such as a single corporation operating more than one type of business or owning property that is not used or held for purposes of any business whose property is centrally assessed. The conclusion posits a corporation that is solely engaged in a business listed in the central assessment statutes, all of whose properties are used or held for use in that business. The cases discussed above appear to involve facts consistent with those assumptions. The court views this assumption as fair for this case, given that nearly all of taxpayer's property is used or held for future use in its communication business and that the amount of other, "non-operating," property is small and uncontested.

change the way centrally assessed property could be valued. The first amendments, in 1913, most notably added the phrase "tangible and intangible" to the definition of "property." Or Laws 1913, ch 193, § 5. The court views this change as either a clarification[32] or as a further broadening of the definition, presumably to encompass businesses operating without a formal franchise. *See Adams Express*, 166 US at 218 ("The statutes grant no privilege of doing an express business, charge nothing for doing such a business, and contemplate only the assessment and levy of taxes upon the property of the express companies situated within the respective states ***.").[33] The 1941 Legislative Assembly added a provision that closely identifies centrally assessed companies with their property by making *all* property tax a personal debt of the centrally assessed taxpayer. By contrast, for a locally assessed taxpayer, only the tax debt on personal property is a personal obligation; the tax imposed on real property applies only *in rem*. *Compare* ORS 311.655 (centrally assessed taxpayers) *and* ORS 311.455 (personal property of locally assessed taxpayers) *with* ORS 312.010 (tax on locally assessed real property is collected by foreclosure). Or Laws 1941, ch 12, § 1. As noted earlier, the 1941 legislature also eliminated ambiguous limiting language that seemed to prevent the direct assessment of franchises. *See* Or Laws 1941, ch 440, § 14. The court has found no statutory history, context, or legislative history on this change, but the court sees no reason to conclude that the 1941 change limited the department's authority to use the value of corporate stock as the basis for the value of corporate property. Following other changes in the 1940s not relevant to this case, in 1951 the legislature repealed the central assessment laws and reenacted without substantive change all of the content relevant to this case. *See* Or Laws 1951, ch 586; Memorandum from Legal Department, State Tax Commission

---

[32] The 1909 definition already encompassed "all property"; the 1905 Legislative Assembly had directed the commission to draft bill proposals to tax "all forms of property, both tangible and intangible"; and the commissioners' 1906 Oregon Report indicated that they thought their bill proposals did that. *See* Or Laws 1905, ch 90, §§ 1, 4; 1906 Oregon Report at 16-17, 22, 26.

[33] Other noteworthy changes enacted in 1913 included changing the name of the central assessment authority from "Board of State Tax Commissioners" to "State Tax Commission," and broadening the commission's authority to determine how to allocate the overall unit value to Oregon. *See* Or Laws 1913, ch 193, §§ 1, 9.

to Subcommittee of House Committee on Taxation (Mar 26, 1951), available from Oregon State Archives; *see also Comcast*, 356 Or at 292. Since 1953, when the legislature recodified the central assessment laws as part of the creation of the Oregon Revised Statutes, the relevant language has been materially changed only twice: first, in 1977 the legislature added a specific exclusion from the definition of "property" for certain intangible property representing shares of stock or claims on other property (bonds and other debt instruments). *See* Or Laws 1977, ch 602, now codified at ORS 308.505(14)(c) (2017). However, the department's representative testified to the Senate Revenue and School Finance Committee that the exclusion merely codified the department's appraisal practices "almost from year one" of the central assessment law, and the committee immediately voted to approve the language as an amendment to the bill. Tape Recording, Senate Committee on Revenue and School Finance, SB 113, June 7, 1977, Tape 31, Side 2 (statement of Assistant Attorney General Ira Jones).[34] Second, in 2015, the legislature adopted an exemption for a portion of the real market value of a centrally assessed company's property; the exemption generally applies to the extent that the aggregate value of the real property, tangible personal property and intangible property exceeds 130 percent of the historical or original cost of the real property and tangible personal property that is included in the unit. Or Laws 2015, ch 23, § 3; ORS 308.674. The court sees nothing in this exemption that changes the approach to valuing the unit of property.[35] Overall, the court concludes that later statutory changes have not changed the legislature's original intention in 1909, as clarified in 1913 and 1941, that the value of the property

---

[34] The 1977 amendment of the definition of "property" in ORS 308.505 occurred as an amendment of a larger bill, the main purpose of which was to affect the treatment of *non*centrally assessed property, particularly "title plants" and other business records stored on electronic or other media. *See Northwest Natural Gas. Co. v. Dept. of Rev.*, 347 Or 536, 550-51, 226 P3d 28 (2010) (background on 1977 law).

[35] The department argues that statements in the legislative history of the 2015 amendment showing that the legislature intended the exemption as a cap on the taxation of "goodwill" imply that the legislature always intended that goodwill be subject to tax. The court rejects any such implication because the laws defining the scope of valuation and taxation predate the 2015 statements by more than a century. *See, e.g.*, *DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d 1316 (1984) ("The views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors.").

held by a centrally assessed company may be determined by the value of the company itself, absent a demonstrable factual difference.

### d.   Cases cited by the parties

The court now tests its understanding of the statutes against the cases the parties have cited. Taxpayer cites two cases in which the Oregon Supreme Court has commented on the difference between the value of the firm or business and the value of the property subject to assessment. Taxpayer cites *Delta Airlines, Inc. v. Dept. of Rev.*, 328 Or 596, 616, 984 P2d 836 (1999) ("Under Oregon law, taxable property must be assessed as of a particular assessment date. \*\*\* Thus, the department's task in this case was to value Delta's taxable property, as a unit, as of the assessment date at issue. \*\*\* [T]he department's task was to determine the value of Delta's assets, not the value of Delta as a firm."), and *Comcast*, 356 Or at 294 ("It bears emphasizing \*\*\* that only the *property* used in the business, service, or commodity is assessed (and thus taxed). The value of the business, service, or commodity itself is not subject to central assessment." (Emphasis in original.)).

*Delta* was the last of a long series of property tax valuation cases in which the Supreme Court sat as a trier of fact, reviewing Tax Court cases under the former *de novo*-on-the-record standard in place until a 1995 law change became operative. *See Delta*, 328 Or at 600-03 (discussing former standard); *United Telephone Co. v. Dept. of Rev.*, 307 Or 428, 432, 770 P2d 43 (1989) (same); *cf. Powell Street I v. Multnomah County Assessor*, 365 Or 245, 445 P3d 297 (2019) (applying current "substantial evidence" standard in ORS 305.445). In *Delta*, the main issue was the treatment of a substantial portion of the taxpayer's aircraft fleet, of which the taxpayer was the lessee under "operating leases," that the court characterized as "more traditional" leases. *Delta*, 328 Or at 599 n 2.[36] The taxpayer presented an income approach based on a "perpetuity" model, which asked the court to assume that the taxpayer would enter into new aircraft leases, continually and into the indefinite future, as

---

[36] By contrast, both parties treated aircraft financed pursuant to "capital leases" as owned by the taxpayer. *See Delta*, 13 OTR at 374-75.

the current ones expired. Based on this assumption, the tax-payer's approach assumed that the proper starting point to estimate future income was the *net* stream of revenue that the taxpayer earned from each aircraft, ignoring the *gross* earning potential of each aircraft. As the Supreme Court stated: "The effect of that calculation was to remove lease payments to Delta's lessors from the income stream subject to capitalization." 328 Or at 604. The department presented an opposing, "limited-life" approach that started with the gross earning potential of each aircraft, with deductions for financing costs and depreciation over the term of the prop-erty's useful life. *Id.*

   The court rejected the taxpayer's perpetuity model and adopted the department's limited-life model, relying in part on the 1989 edition of the Western States Association of Tax Administrator's (WSATA) Handbook, which the depart-ment at that time had adopted by reference as an Oregon administrative rule. *See former* OAR 150-308.655 (1999).[37] It was in the course of rejecting the taxpayer's proffered perpetuity approach—and with it the taxpayer's net income starting point—that the court made its statement that the department's task was to value Delta's property, not the firm:

> "The handbook * * * answers the question whether use of the limited-life or perpetuity model was appropriate in this case. The handbook provides that, when the taxation requirement is to value assets that exist on the assessment date, it is proper to forecast the expected income 'over the remaining economic life of the existing assets,' *i.e.*, to fol-low a limited-life model. * * * In contrast, the handbook provides that '[*f*]*orecasting income into perpetuity is proper when the corporate entity is being valued.*' * * *
>
> "* * * [T]he perpetuity model would not have been appro-priate here, because the department's task was to deter-mine the value of Delta's assets, not the value of Delta as a firm. Accordingly, we reject Delta's contention that the department erroneously applied the limited-life model in its income approach."

*Delta*, 328 Or at 615-16 (emphasis added).

---

[37] Today's Oregon rule adopts the 2009 edition of the WSATA Handbook. *See* OAR 150-308-0690.

Since the Supreme Court's opinion in *Delta*, the WSATA Handbook has been revised "substantially." *See* WSATA Handbook at I-1 (2009 ed). It is not clear that the Supreme Court would interpret the current discussion of perpetual vs. limited-life approaches in the same way it viewed the discussion in the then-current 1989 edition. In contrast to the passage that the Supreme Court quoted above, the 2009 edition of the Handbook provides: "Forecasting income into perpetuity is proper when a *going concern* is being valued." *Id.* at III-7 (emphasis added). A footnote on the preceding page offers the following discussion: "'Going concern' as used here is *not synonymous* with enterprise value. *Enterprise value is a broader term which encompasses the value of a corporate entity* including all of its tangible and intangible assets; it is a valuation of the present owner's total business *in contrast to the exchange valuation of operating assets as a going concern*." *Id.* at III-6 n 36 (emphases added). The current WSATA Handbook discussion thus seems to imply that the perpetuity approach may be appropriate even when the subject of the valuation is limited to the operating property and is *not* the corporate entity. Without expressing any view about the correctness of the current WSATA Handbook, the court concludes that the difference compared to the prior edition's discussion of this topic reduces any precedential value that *Delta* otherwise might have. In any event, in *Delta* as in many prior cases under the former *de novo*-on-the-record standard, the Supreme Court frequently cautioned litigants against assigning precedential weight to the court's choice of one or another valuation method. *See Delta*, 328 Or at 615 n 11 (referring to the court's "repeatedly" made statements that its "earlier valuation cases provide no precedential value").[38] For all of these reasons, this court interprets the language in *Delta* on which taxpayer relies as primarily directed at rejecting Delta's attempt to discount the projected revenue

---

[38] In addition, more recent decisions suggest that the Supreme Court today might reach the same ultimate conclusion on the facts in *Delta* based on a different analysis, by focusing on Delta's full "use" of the aircraft rather than on Delta's interest as owner vs. as lessee. *See PacifiCorp Power Marketing v. Dept. of Rev.*, 340 Or 204, 210, 131 P3d 725 (2006) (finding that taxpayer's contracts demonstrated that it "used" property constituting the Intertie within the meaning of ORS 308.515(1)).

stream based on Delta's choice to lease its income-producing property instead of owning it. The court declines to assign any weight to the Supreme Court's statement as it relates to using the value of Delta as a company to determine the value of Delta's property.

Turning to taxpayer's second case, in *Comcast*, 356 Or at 282, the comment that taxpayer cites appeared as part of the Supreme Court's introduction to the concepts of central assessment and was the only statement in the 53-page opinion that mentioned a distinction between the property and the business. The Supreme Court never reached the issue of valuation; it focused on the antecedent question of whether Comcast was engaged in the "communication" business within the meaning of ORS 308.515(1). Rather than rely on that comment, this court turns to the most recent opinion on which the parties supplied supplemental briefing shortly after its issuance, namely, *DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 434 P3d 379 (2019). There, the Supreme Court stated that unit valuation as permitted by ORS 308.555 "actually values the company as a going concern: It considers a company's market value as a whole and does not, either in practice or in theory, purport to assess the various component parts that go into that whole." 364 Or at 292. In *DISH Network*, in contrast to *Comcast*, the court's statement was in response to the taxpayer's argument on a point actually at issue in the case: whether the centrally assessed unit of property could be added to the roll without offset for any tangible personal property that county assessors already had subjected to local assessment. The taxpayer argued that the addition would subject the company's tangible personal property and real property in Oregon to double taxation, relying on a description of the unit valuation approach that the court concluded ignored Oregon's express statutory inclusion of intangible property in the definition of "property." *See id*. at 291. The quoted passage in *DISH Network* is consistent with the view of courts dating as far back as the *State Railroad Tax Cases* that the value of the company as a whole is a permissible indicator of the value of all of its tangible and intangible property.

Overall, regarding taxpayer's legal question, the court concludes that Oregon's central assessment law does

not dictate a specific valuation method, but it certainly does not stand for the proposition that use of the value of the company or its shares of stock as an indicator of, or proxy for, value is invalid as a matter of law. The court sees no indication in the statutory text or context that the legislature has imposed any legal requirement to distinguish between the value of the company to its shareholders and the value of all of the company's tangible and intangible property. Indeed, the legislature has blurred the line between a centrally assessed company and the property it uses, most notably by incorporating into the definition of "property" a corporation's inalienable right to exist.

e.  Taxpayer's no-growth argument (investment Attributes 1 through 4)

The court now returns to taxpayer's argument that the court must reject the only factors that could generate growth in gross revenue because those factors are intangible Attributes of the shares of taxpayer stock and are not property that taxpayer owns. The court considers taxpayer's description of each such Attribute, starting with future tangible and intangible property, as well as the present value of future growth opportunities and potential mergers and acquisitions (numbered in the table above as Attributes 1 through 4). As recited above, taxpayer presented comprehensive, and largely unrefuted, evidence that the equipment in place on any assessment date was not capable of generating growth in revenue because it quickly became obsolete, even as customer demand for capacity constantly increased. The court agrees with taxpayer, and finds as a fact, that the only way taxpayer could satisfy customers' increasing demand and increase taxpayer's own revenue was by constantly acquiring new equipment by direct purchase or by acquiring or merging with other companies that had the needed equipment. However, from that factual premise taxpayer argues that the court should not consider the value of equipment resulting from future direct purchases or future mergers or company acquisitions because each of those purchases or other transactions depends on an investor's willingness to invest in taxpayer's shares of stock, as opposed to the value of property that taxpayer had in use on the assessment date. Taxpayer does not argue that the *company*

had no prospects for growth. Therefore, the court views taxpayer's argument regarding Attributes 1 through 4 as primarily a legal argument that the court should ignore the value of these Attributes because they inhere in taxpayer's shares of stock and are not property that taxpayer itself owns.

The department cites one case on point with respect to taxpayer's no-growth argument. *United Telephone Co. v. Dept. of Rev.*, 10 OTR 333, 340-41 (1986), *modified*, 307 Or 428, 770 P2d 43 (1989). The department relies in particular on the following statement of this court:

> "[The taxpayer's expert] reasons that 'we're valuing just the assets in the asset pool today. We cannot consider future growth in plant because it's not legal to assess plant not in existence.' \* \* \*
>
> "In this regard, [the taxpayer's expert] makes a fundamental error. It is true that the tax laws tax only the existing assets. However, the ad valorem tax is levied on the present value of the assets. That value includes *all* benefits expected to be received in the future from those assets. If any growth is expected, the present value of those expectations must be reflected in the fair market value of the property. Growth must come from something. If any growth is expected, it is the taxable assets which will produce it. Hence, the value of existing assets includes their potential for growth, just as the value of a thoroughbred horse includes the potential for future offspring. While the state cannot tax that future offspring because it is not in existence, the potential of the thoroughbred horse to produce offspring is an element of value which can be and must be taxed. Utilizing a market rate of return which includes expectations of future growth but projecting income without growth results in an undervaluation of the assets."

10 OTR at 340-41. Taxpayer does not respond in briefing, but during trial taxpayer pointed out that the Supreme Court modified this court's opinion on appeal and countered that taxpayer's property, unlike the racehorse in the court's analogy, was equipment that could not reproduce. In reviewing both opinions, it is clear that the taxpayer in *United Telephone* squarely presented the question whether the value of today's centrally assessed property can be determined by

an income approach that looks to the income to be generated by property that will be acquired after the assessment date. However, the ultimate answer to that question from this court and the Supreme Court is less clear. This court squarely answered "yes" in the passage quoted above. Under the *de novo*-on-the-record standard of review in place at the time, however, the Supreme Court did not reach this court's legal conclusion that future growth in revenue is necessarily attributable to the property presently in place, because the Supreme Court agreed with the taxpayer as a factual matter that no growth in revenue was likely to occur. *United Telephone*, 307 Or at 441-42.[39] The Supreme Court's conclusion of value using the income approach assumed no growth in revenue, and no growth in the rate of investor return; in addition, the Supreme Court adopted a projected income amount slightly different from that apparently used by this court. *Id.* at 434-35, 442.

The Supreme Court's modification of this court's judgment in *United Telephone* leaves the precedential effect of this court's statement about attributing future revenue growth to existing property open to question. This is particularly true because, as the Supreme Court pointed out, this court did not fully explain the source of its conclusion of value under the income approach. *See id.* at 441. The court now declines the department's invitation to rely on this court's statement in *United Telephone*.[40]

---

[39] The Supreme Court apparently accepted that the taxpayer would do no more than reinvest recovered depreciation on company property continuously, thus assuring a future income stream, but not creating growth. *See United Telephone*, 307 Or at 435.

[40] Similarly, while the Supreme Court appeal in *United Telephone* was pending, this court also decided *PP&L v. Dept. of Rev.*, 10 OTR 417 (1987), *modified*, 308 Or 49, 775 P2d 303 (1989), in which the parties relied on the same set of valuation expert witnesses as in *United Telephone*. As in *United Telephone*, the taxpayer's expert presented an income approach that assumed no growth in future revenues, stating his understanding that the state "'cannot tax assets not in existence.'" *PP&L*, 10 OTR at 429. This court, citing its opinion in *United Telephone* before modification, rejected the expert's position on the ground that the law does not tax future property but assigns value to the current property based on the an "anticipation of future benefits" inherent in the current property. *PP&L*, 10 OTR at 431. The Supreme Court likewise rejected the taxpayer's "no growth" position, but it did so on the factual ground that the company's own projections indicated that it anticipated growth, and without commenting on this court's rationale on that point. 308 Or at 58-59.

The court finds more apposite the Supreme Court's reasoning in *Union Pacific Railroad Co. v. Dept. of Rev.*, 315 Or 11, 843 P2d 864 (1992). There, the court, applying the same former *de novo*-on-the-record review standard, expressed no concern about looking to the revenues from property to be acquired in the future, although the court also ultimately accepted the taxpayer's "no-growth" argument as a factual matter. The court stated as a general proposition:

> "Growth in net cash flows will arise either because the present asset base generates additional income *or because additions to the asset base produce income beyond the cost of the additions themselves*, including the costs of operating them. The latter source of growth will be possible *only if an investor is prepared to forego some immediate return on investment (*i.e.*, an amount equal to the cost of the new income-producing assets) in order to experience more satisfactory returns in the long run*. If the net cash flows generated by increases in the asset base do not exceed the cost of the additional asset base and the costs of their operation, then there has been no 'growth' from an investor's standpoint."

315 Or at 22 (emphases added). The Supreme Court's comments reflect an apparent conclusion that Oregon law allows the department to consider future additions to the asset base in estimating future cash flows, even though those additions will occur only if investors—shareholders or lenders—invest more money in the company itself. Although the case is not precedential as to how to determine the value of a centrally assessed unit of property,[41] it is an indicator that Oregon recognizes no legal barrier to considering the cash flows to be generated by future properties, and it indirectly supports the conclusion that an Attribute that attracts outside investment in the company may be included in the value of the unit of property.

This court cannot accept taxpayer's no-growth argument. The court is of the view that the potential for revenue growth may derive from an attribute of the unit of

---

[41] As noted above, while the *de novo*-on-the-record standard of review was in place, the Supreme Court repeatedly cautioned parties that its own opinions carried no precedential weight, to the extent the court engaged in the factual determination of the value of property. *See Delta*, 328 Or at 615 n 11.

assembled equipment, real property, customer relationships and workforce in place, or from the ability of the company to attract merger partners and additional capital investment as taxpayer argues, or from a combination of these factors. It is not necessary to pinpoint the source of the growth potential in this case, however, because the court concludes that the legislature fully intended any or all such factors to "count" in the valuation of the unit of real, tangible and intangible property in place on any given assessment date. Taxpayer's sole objection regarding these Attributes is based on its legal position that the potential for any such growth derives from Attributes inherent in taxpayer as a company. Taxpayer has not sought to contest the department's projections, supported by the department's appraisal evidence, that taxpayer as a company will experience growth in revenue of three percent as of January 1, 2014, or two percent as of January 1 of 2015 and 2016.

### f.   Investment Attributes 5 through 12

The court next considers the remaining Attributes Nos. 5 through 12: stock liquidity; investor limited liability; the absence of a requirement to reinvest; protection from the risk of personal bankruptcy; the prospect that taxpayer stock will appreciate in value instead of depreciating; the ability to make small-dollar-amount investments and thus to create a diversified investment portfolio, and the prospect of favorable income tax treatment upon the sale of appreciated stock (presumably referring to benefits such as a reduced federal income tax rate for gain from disposition of stock held as a capital asset; and the absence of depreciation recapture upon the disposition of stock). Taxpayer essentially argues that these Attributes have value, and that value belongs to taxpayer's shareholders, not to taxpayer as a company.

The court is skeptical that some of the Attributes actually created value for taxpayer's shareholders as a factual matter. Taxpayer has not attempted to quantify the specific increment of value associated with any one Attribute, nor has taxpayer presented evidence from which the court could determine an incremental value. The value of some Attributes seems uncertain, or potentially illusory,

when the task is to consider the value of all shares of stock together. The court questions whether liquidity, *i.e.*, the ability to make small and limited investments and to diversify (Attributes 7, 10, and 11) actually is different for the holder or holders of *all* shares of company stock considered together than for the company as holder of all company property. Even the Attributes of limited liability and protection from the risk of bankruptcy or creditor claims (Nos. 6 and 8) are difficult to assign cleanly to the shares in the corporate entity when all tangible and intangible property is at issue. An arm's-length transaction to acquire all of the property can burden the buyer with substantial liabilities attributable to the seller's conduct. *See* Howard L. Shecter, *Selected Risk Issues in Merger and Acquisition Transactions*, 51 U Miami L Rev 719, 740-44 (1997) (discussing asset purchaser's risk of successor liability under product liability, environmental, employee benefit, and labor and employment law); Jerome R. Hellerstein, Walter Hellerstein & John A. Swain, *State Taxation* ¶ 19.11 (3d ed updated 2019) (discussing potential liability of purchaser of substantially all assets for delinquent sales taxes of seller). An informed buyer of assets may require the seller to agree to indemnify the buyer, provide other personal guarantees, or accept a lower purchase price in order to offset those risks. *See* Lou R. Kling, Eileen Nugent Simon, and Michael Goldman, *Summary of Acquisition Agreements*, 51 U Miami L Rev 779, 804-08 (1997) (indemnification provisions). Ultimately, the choice whether to "structure" a substantial transaction as a sale of all the shares of stock or as a sale of all the corporate property may require a sophisticated analysis of competing considerations in which the benefits of liability limitation and protection from creditors may be unclear or minimal. As to the prospect of favorable income tax treatment (Attribute 12), the court finds that Attribute of only speculative value given the possibility of law changes and the prospect that any particular seller of stock may be factually unable to take advantage of any particular income tax law. *See* Boris Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts*, ¶ 49.1 (2d ed updated 2019) ("Gain or loss on a sale or exchange of a capital asset is long-term capital gain or loss only if the property was held for more than one

year; it is short-term capital gain or loss if the property was held for one year or less."); *see also Joseph Hydro Associates, Ltd. v. Dept. of Rev.*, 10 OTR 277, 280-85 (1986) (questioning value to assign to state energy and federal investment tax credits).

Finally, because virtually all of the subject property in taxpayer's case is used in the same centrally assessed business of communications, the court need not, and does not, reach a decision as to whether any of the Attributes inhere in the corporation or in its property: they are properly taken into account regardless. Because taxpayer does not disagree with the department's factual conclusion as to their value, and does not present a factual case on the specific effect of any one Attribute on the value of the property, the court accepts the department's revenue growth rates of three percent for tax year 2014-15 and two percent for tax years 2015-16 and 2016-17.

B.   *Cost Approach*

Each party performed an analysis of value using the cost approach. "The cost approach to value is based upon the principle of substitution, that is, it assumes that property is worth its cost or the cost of a satisfactory substitute with equal utility. Thus, the cost approach seeks to determine the cost of the unit that is being valued." *Delta*, 328 Or at 605. The department's expert gave "the least reliance" to the cost approach, compared to the income and market approaches. Taxpayer uses the cost approach only as a "high benchmark" of value but assigns it no weight in taxpayer's overall conclusion of value. Taxpayer's main criticism is that the department erred by treating "accounting goodwill" as property with a value that can be counted as part of the value of the overall unit for central assessment purposes.[42] The Accounting Goodwill to which taxpayer refers is reflected in an entry appearing on each of taxpayer's annual financial statements as filed with the Securities and Exchange Commission (SEC) as follows:

---

[42] For convenience, the court adopts taxpayer's term "Accounting Goodwill" to refer to the amounts that the department included and that taxpayer contends should be excluded or ignored. The court intends its usage to be synonymous with the definition in ASC 805-30-20 as discussed below.

| Calendar Year | "Accounting Goodwill" Amount | Citations | Notes |
|---|---|---|---|
| 2013 | $2,577,000,000 | Def's Ex A at 63 Def's Ex Q at 107, 125 | |
| 2014 | $7,689,000,000 | Def's Ex B at 63 Def's Ex R at 109, 126 | Form 10K states that $5,124,000,000 of total goodwill is "Goodwill acquired in tw telecom acquisition" |
| 2015 | $7,749,000,000 | Def's Ex C at 63 Def's Ex S at 116, 122 | Form 10K states that $5,124,000,000 of total goodwill is "Goodwill acquired in tw telecom acquisition" |

The department's expert Eyre included the Accounting Goodwill as a line item for "goodwill" in his list of items that add up to his overall conclusion for each tax year under the cost approach. He described this type of goodwill as "operating property." To illustrate, the chart below reproduces the contents of an exhibit showing Eyre's conclusions for tax year 2016-17:

**2016-17 Tax Year**
**Defendant's Historical Cost Less Depreciation Indicator of Value**
**(Def's Ex C at 63)**

| | |
|---|---|
| Land | $ 180,000,000 |
| Land Improvements | $ 76,000,000 |
| Facility & Leasehold Improvements | $ 2,582,000,000 |
| Network Infrastructure | $ 8,979,000,000 |
| Operating Equipment | $ 7,988,000,000 |
| Furniture, Fixtures and Office Equipment | $ 242,000,000 |
| Other | $ 28,000,000 |
| **Total Property, Plant & Equipment** | **$ 20,075,000,000** |
| Less: Accumulated Depreciation | $ (10,365,000,000) |
| **Net Property, Plant & Equipment** | **$ 9,710,000,000** |
| Construction Work in Progress | $ 168,000,000 |
| Goodwill | $ 7,749,000,000 |
| Other Intangible Property, net | $ 1,127,000,000 |
| **Historical Cost Less Depreciation Indicator of Value** | **$ 18,754,000,000** |

For tax years 2015-16 and 2016-17, the entry for Accounting Goodwill constitutes approximately 41 percent of overall value; for tax year 2014-15, it is approximately 23 percent. Taxpayer notes that simply removing the department's entry for Accounting Goodwill from the department's overall cost indicator of value for each year would bring the department's indicator much closer to the value taxpayer asserts.

Taxpayer's rebuttal expert Reilly testified at length about the origin and use of the amounts shown as Accounting Goodwill on taxpayer's filings with the SEC. As a publicly traded company, taxpayer calculated and reported the amounts in order to comply with the SEC's requirement to prepare and disclose reports in accordance with "generally accepted accounting principles" (GAAP). *See* 17 CFR §§ 210.4-01. GAAP includes the Financial Accounting Standards Board's rules set forth in the Accounting Standards Codification (ASC), among them ASC 805-30, which prescribes when and how a company must record an entry for goodwill after a business combination such as an acquisition. The ASC defines goodwill as "[a]n asset representing the future economic benefits arising from other assets acquired in a business combination *** that are not individually and separately recognized." ASC 805-30-20. Reilly, whose extensive credentials include a CPA license, licensure as a certified general appraiser in Oregon, and an MBA from Columbia University, testified essentially that Accounting Goodwill, as thus reported, is simply a residual amount that represents the positive difference between the fair value of the identifiable assets and the actual amount paid.[43]

Based on the premise that the amount that taxpayer reported to the SEC as Accounting Goodwill is a residual amount, as opposed to an amount determined by valuing an identifiable asset, taxpayer argues that Accounting Goodwill is not "property" within the meaning of Oregon law. Taxpayer distinguishes the terms "assets"

[43] Reilly offered examples of "identifiable" intangibles that must be separately valued, as well as items that fit within the overall label of "goodwill" for purposes of the ASC.

and "property": assets include identifiable items whose value can be determined separately, as well as the nonidentifiable asset goodwill, the amount of which value is measured arithmetically as a residuum. According to taxpayer, "property" is a subset of "assets," consisting of only the identifiable items. Because Accounting Goodwill as defined by ASC 805-30-20 is not identifiable, it cannot be property, and the department should exclude it when applying the cost approach. Reilly prepared a report that shows the effect of eliminating Accounting Goodwill from the department's cost approach.[44]

The court accepts elements of taxpayer's argument, but the court sees no basis in Oregon law to adopt taxpayer's definition of "property" in relation to the accounting term "assets," nor can the court accept a legal conclusion that goodwill can never be valued as "property" under ORS 308.555. To start with, the court is persuaded that the amounts that the SEC required taxpayer to report as Accounting Goodwill are merely residual and thus are not the result of any attempt to separately determine the value of an item of property that is positively identified as "goodwill" in the ordinary meaning of that word. But this alone is not a reason to disregard or exclude the amount in determining the value of the unit of property for central assessment purposes. The definition in ASC 805-30-20 itself makes clear why: the amount reported as Accounting Goodwill "represent[s] the future economic benefits arising from other assets * * *." Similar to the prospects for future income growth as discussed above, the court understands this definition to describe either an attribute of the assemblage of real property and tangible and intangible personal property held by the company, or an attribute inherent in the stock or other ownership interests held by the owners of the company. To the extent that taxpayer's argument is a legal one regarding the definition of "property," the court already has resolved it above by concluding that nothing in Oregon law prevents the court from treating the amount properly assigned to those kinds of attributes

---

[44] Reilly's report notes that the amount derived by the mere removal of Accounting Goodwill as a line item does not represent his opinion of taxpayer's market value.

as a component of the value of the company or its property under ORS 308.555.

Factually, however, the way that the amount of Accounting Goodwill is derived initially, and then preserved in years after the business combination occurs, causes the court to question the usefulness of the concept of Accounting Goodwill for property tax valuation purposes. Reilly's testimony and exhibits indicate that the ASC requires an acquiring company to initially report the amount of Accounting Goodwill on the first financial statement the company files after a combination. Accordingly, ASC 805-30-20 applies only to acquired goodwill, and the amount reported does not purport to be or include the value of the company's own, self-created goodwill, assuming that any exists. By contrast, the plain meaning of "goodwill" may include relationships and other intangible items that the company has created over years of doing business.[45] Moreover, for later reporting years the ASC does not necessarily require the company to report changes in the amount of Accounting Goodwill. Rather, the company must annually "test" its Accounting Goodwill for potential "impairment," which essentially requires determining the current business enterprise value, then subtracting the current value of the tangible assets and identifiable intangible assets. If the resulting residual amount equals or exceeds the existing amount

---

[45] The parties' arguments about goodwill focus solely on the Accounting Goodwill amounts that taxpayer reported pursuant to ASC 805-30-20. The plain meaning of "goodwill" is broader and encompasses not only the general residual concept at issue in this case ("the excess of the purchase price of a business over and above the value assigned to its net assets exclusive of goodwill"), but also a range of attributes "incidental to the business" ("the custom of a trade or business: the favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude, or any other circumstance incidental to the business and tending to make it permanent"). *Webster's Third New Int'l Dictionary* 979 (unabridged ed 2002). *Cf. Webster's Int'l Dictionary of the English Language* 638 (1907) ("[t]he custom of any trade or business; the tendency or inclination of persons, old customers and others, to resort to an established place of business; the advantage accruing from such tendency or inclination"); *Black's Law Dictionary* 544 (2nd ed 1910) ("every positive advantage[] that has been acquired by a proprietor in carrying on his business, whether connected with the premises in which the business is conducted, or with the name under which it is managed, or with any other matter carrying with it the benefit of the business").

of Accounting Goodwill, then the Accounting Goodwill amount is not impaired and that same existing amount is carried forward unchanged on the financial statement for that subsequent year. Taxpayer undertook the required impairment testing annually, according to its financial statements, with the result that the amount shown as Accounting Goodwill attributable to the 2013 acquisition of tw telecom is exactly the same for calendar years 2014 and 2015: $5,124,000,000. The court therefore is concerned that the reported amount may bear little relationship to the aggregate value of taxpayer's customer and vendor relationships, workforce in place, and other items within the ordinary meaning of "goodwill." These concerns about the usefulness of the Accounting Goodwill amount do not cause the court to simply subtract it from the department's cost indicator of value, as taxpayer requests. Instead, these concerns justify limiting the weight that the court will assign to the cost approach, as will be discussed below.

In addition to taxpayer's argument based on the allegedly erroneous treatment of goodwill as property, taxpayer urges the court to reject the department's cost approach on the ground that Eyre failed to assume an accurate rate of obsolescence for taxpayer's equipment. Taxpayer's witnesses Laurel Clark (an electrical engineer employed by taxpayer as principal network architect) and William Gray (an electrical engineer/MBA and inventor employed as taxpayer's executive architect of profit acceleration) testified cogently and without serious evidentiary challenge from the department that taxpayer's equipment becomes obsolete remarkably quickly, due to a combination of rapid technological advancement and rapid growth in customer demand for capacity. Taxpayer claims that Eyre inappropriately relied on ordinary book depreciation to reflect the rate of obsolescence, and that he should have adjusted the rate further for both functional and economic obsolescence. Eyre defended his reliance on book depreciation as a source taxpayer itself generated; he also testified that his cost approach used historical cost as a starting point, and that a specific adjustment to historical cost would be "improper" under GAAP. Although such an adjustment

would be allowable in an analysis based on replacement or reproduction cost, compiling the data to use either of those methods would require extensive resources and, in the end, "would [not] give you a better estimate of value than what you get with your income or market approach to value."

The court does not consider it necessary to resolve the parties' disagreement over the extent of any adjustment to the department's historical cost indicator of value. The court already has deep concerns that Accounting Goodwill is at best an incomplete amount that excludes any self-created goodwill, and that the amount becomes less reliable as it is carried forward to future years. These concerns apply regardless, whether goodwill is viewed as an attribute of the shares or other ownership interests in the company or as intangible property that the company holds. Because the amounts shown as Accounting Goodwill in this case constitute between 23 percent and 41 percent of the department's total cost indicator of value, the court finds the department's entire cost indicator of no use. The department's own rebuttal expert, Dr. Antonio Bernardo, recommended assigning no weight to the cost approach, undermining even Eyre's approach of assigning the "least" weight to the cost approach. Taxpayer's own valuation analyses do determine a cost approach indicator of value,[46] but they place no weight on the result, characterizing it instead as a "high benchmark corroboration" of the value derived by the income approach. The court assigns no weight to either party's proffered result under the cost approach.

C.  *Market Approach*

The third major approach to value is the market approach, which relies on the prices at which similar properties have sold in arm's-length transactions. *See PP&L,* 308 Or at 55-56. The market approach is difficult to apply when valuing the property of large enterprises such as taxpayer,

---

[46] At least for the two tax years unaffected by the unit dispute, taxpayer's resulting value corresponds closely to Eyre's Historical Cost Less Depreciation result illustrated in the table above, minus Accounting Goodwill.

because comparable units of property rarely are sold. *See id.* To address this problem, the "stock and debt" approach has developed, which looks to the value of the company's stock and debt as a proxy for the value of the property that the company holds. *See id.* As would be expected, given taxpayer's legal and factual arguments discussed above, taxpayer entirely rejects application of the stock and debt approach, on the ground that:

> "[s]tock prices include the value of people, reputation, expectations of profitability on future assets and investments, brand identity, contracts and a host of intangibles.
>
> "People are not property, but the skills and abilities of the management team were a significant part of the price of Level 3 shares. In addition stock prices reflect growth forecasts which imply higher profitability in the future than existing assets can produce without additional capital expenditures."

Thus, for essentially the same reasons discussed above, taxpayer performed no analysis under the stock and debt approach.

The department did perform a stock and debt market approach analysis and places "significant" or "secondary" reliance on that approach. Taxpayer criticizes the department's approach for including the value of Investment Attributes, that the court has addressed above, and for valuing taxpayer's business enterprise as a "going concern." On the latter point, taxpayer seeks to distinguish between the valuation of *property* on a "going concern premise of value" and valuation of the enterprise itself. Although the court appreciates taxpayer's distinction, the analysis above indicates that the distinction essentially does not matter for Oregon central assessment purposes.

Beyond urging rejection, taxpayer offers no alternative computations under a stock and debt approach. Although the department's stock and debt analysis reaches substantially higher conclusions of value than shown in any of the department's income approach methods, as discussed below in the court's reconciliation analysis, the court accepts the

overall validity of the department's stock and debt indicator of value.

## D.   *Taxpayer's Other Methodology Arguments; Reconciliation of Values; Department's Burden of Proof*

Taxpayer disputes a number of other specific steps the department took in determining the value of the unit of property. Taxpayer's rebuttal witness Reilly identified 10 alleged errors in the department's appraisal reports. The court considers six of the 10 issues to be addressed (and rejected) in the court's discussion of the income approach,[47] and three are rendered irrelevant by the court's conclusion that the cost approach is entitled to no weight in this case.[48] As to one criticism—that the wide range of value indicators in Eyre's reports reduces the overall credibility of the reports—taxpayer cites no authority and offers

---

[47] Reilly asserts that Eyre erroneously "perform[ed] a business valuation rather than a unit principle valuation" (Criticism #1); "relied on the Level 3 business enterprise expected long-term growth rates" (#5); erroneously used a "direct capitalization income approach" that is suited for business valuations but not for the valuation of property (#8); and "failed to remove (a) intangible investment attributes and (b) the present value of future growth opportunities" (#9).

Reilly also criticizes Eyre's report for "fail[ing] to estimate a credible weighted average cost of capital" (#6). On close examination, this sixth criticism also rests on taxpayer's legal and factual theories addressed above. Reilly's sixth criticism attacks Eyre's use of the "capital asset pricing model" (CAPM), that in Reilly's view is suitable for a "relatively short-term investment in publicly traded securities," but not suitable for the controlling interest in "illiquid operating assets of an individual corporation." Reilly proceeds to propose alternative computations that start with Eyre's method but modify it to reduce reliance on the CAPM. While the court appreciates receiving alternative computations that translate taxpayer's theory into specific results, the court cannot rely on them here because they rest substantially on a premise that Oregon law requires a sharp distinction between valuing the unit of property and valuing the company that uses it. The court has concluded that Oregon law does not require that distinction.

Reilly's seventh criticism is that Eyre "failed to select relevant guideline publicly traded companies" (#7). Eyre chose AT&T Inc., CenturyLink, Inc., and Verizon Communications Inc. and Reilly viewed those companies as not comparable to taxpayer due to their much larger size and lower risk profile. The value difference attributable to this factor is, however, not apparent, as Reilly included the issue in his computations under Criticism #6, which the court does not accept as discussed above.

[48] Reilly asserts that the department erroneously ignored two replacement cost methods in favor of a strictly historical cost method (#2); included recorded goodwill (#3); and incorrectly measured the amount of economic obsolescence affecting taxpayer's property (#4).

no alternative calculation specific to this point; the court assigns it no weight.[49]

Having rejected taxpayer's only value computations as incorporating an incorrect view of the scope of property that may be valued, the court now examines whether the department has carried its burden to prove values higher than those on the assessment roll. The court first considers the most substantial potential increases, namely, those asserted in the department's amended answers. In the amended answers, which the court allowed approximately seven weeks before trial, the department asserts values derived from a transaction involving CenturyLink, Inc. The parties dispute nearly every aspect of the transaction, including whether to refer to it as an acquisition of taxpayer by CenturyLink or as a merger; the tax year in which the transaction should be considered to have occurred; the final amount of consideration; and whether and how the consideration should be allocated among taxpayer's assets. *See Level 3 Communications, LLC v. Dept. of Rev.*, 22 OTR 533, 534 (2018). In any event, the department's experts Eyre and Bernardo did not use the transaction in their respective analyses, and the department describes the transaction only as "corroborat[ing]" Eyre's analysis. The date the department relies on for the transaction, November 1, 2017, was nearly two years after the January 1, 2016, assessment date for the last of the three tax years at issue. The court accordingly assigns no weight to the CenturyLink transaction and the values the department asserts in its amended answers.

As to the values concluded by the department's appraiser, Eyre relied on two acceptable valuation approaches: the income approach and the market approach, as well as the cost approach, which the court rejects. As the first table in this opinion shows, Eyre's overall conclusions of value for tax years 2015-16 and 2016-17 are relatively close to those on the

---

[49] Eyre's range of value conclusions is summarized in Table 2 on page 498. The court notes that the department explains the wide range in Eyre's conclusions by the fact that the assessment dates for tax years 2015-16 and 2016-17 were close in time to taxpayer's late 2014 acquisition of tw telecom, which caused Eyre's market approach conclusions, and to some extent his income approach conclusions, to increase substantially.

Table 2

| Tax Year | Overall Conclusion | DCF | Direct Cap | Constant Growth Yield Capitalization | Market | Cost |
|---|---|---|---|---|---|---|
| 2014-15 | $12,150,000,000 | $11,187,000,000 | $14,496,000,000 | $10,413,223,140 | $15,897,624,275 | $11,022,000,000 |
| 2015-16 | $16,650,000,000 | $14,534,000,000 | $17,803,000,000 | $13,885,245,902 | $28,056,474,824 | $18,963,000,000 |
| 2016-17 | $19,150,000,000 | $17,546,000,000 | $23,826,600,000 | $16,495,176,849 | $26,840,703,743 | $18,754,000,000 |

roll.[50] The table above shows that Eyre's DCF and constant growth yield capitalization values for those years are somewhat below his ultimate conclusion, but the market approach conclusions are substantially higher (more than $28 billion and $26 billion, respectively, for tax years 2015-16 and 2016-17). Eyre does not disclose what weight he gave to each approach, other than to say he gave "the least" weight to the cost approach and gave the market approach "secondary" weight (less than the income approach). The court ordinarily would be inclined to modify Eyre's overall conclusions to account for the fact that he gave any weight at all to the cost approach, but neither party has provided the court with the data to do so, as nearly all of taxpayer's criticisms are grounded in, or intertwined with, taxpayer's theories of the definition of property. Moreover, Eyre's cost approach values are slightly higher than the roll value for tax year 2015-16 and slightly lower than the roll value for 2016-17, roughly canceling each other out. Accordingly, the court sustains Eyre's conclusions that the RMVs for the two tax years are as shown below:

| Court's Conclusions of RMV for 2015-16 and 2016-17 | | |
|---|---|---|
| Tax Year | System | Oregon |
| 2015-16 | $16,650,000,000 | $184,815,000 |
| 2016-17 | $19,150,000,000 | $224,055,000 |

### E.   *Unit Issue for 2014-15 Tax Year*

The court can understand the frustration of a taxpayer that undergoes central assessment for a number of years based on a unit of property that the department defines by a particular geographic area, and in the course of an appeal is presented with a new department valuation based on a greatly expanded unit. Notwithstanding the formulary approach by which a portion of the value of the unit is allocated to Oregon, expanding the pie often means that Oregon receives a larger slice in terms of absolute value.

---

[50]  For 2015-16, Eyre's overall conclusion of an Oregon RMV of $184,815,000 is 5.91 percent higher than the $174,500,000 shown on the roll. For 2016-17, Eyre's Oregon RMV is $224,055,000, which is 1.61 percent higher than the roll value of $220,500,000.

In this case, the department's selection of a new unit for tax year 2014-15 during this appeal led the department's appraiser to conclude an Oregon RMV of $127,575,000, as opposed to the roll RMV of only $68,000,000. However startling that increase may be, the court finds nothing in Oregon law that prevents the department from making the change during litigation in this court.

ORS 308.555 clearly authorizes the department to "value *the entire property*, both within and without the State of Oregon, as a unit." (Emphasis added.) As a textual matter, this statute encompasses a potential unit that extends as far as a taxpayer's centrally assessed business, including worldwide. As discussed above, other portions of the central assessment statutes, as well as the historical context, show that the Oregon legislature expected the taxing authority to consider the company's entire property. The same statute uses the word "may" in conferring unit valuation authority on the department, indicating a level of discretion. A discretionary authority to use unit valuation or not, and to determine a unit with company-wide reach, also impliedly authorizes the department to determine a unit that could range in size from a single facility or other item of property to *all* property that the company uses or holds in its centrally assessed business. Although courts have interpreted the several statutes that exclude certain property from the permissible unit (generally based on the degree of use in connection with the listed business),[51] the court is not aware of any cases that interpret the scope of the department's discretionary authority to define whether the unit encompasses only a particular standalone facility, a particular set

---

[51] *See generally* ORS 308.505(9)(c) (excluding from the unit items of intangible property that represent *** "[c]laims on other property, including money at interest, bonds, notes, claims, demands or any other evidence of indebtedness, secured or unsecured; or *** [a]ny shares of stock in corporations, joint stock companies or associations"); ORS 308.515(1) (central assessment generally does not apply to property not used or held for future use in performing or maintaining a business or service listed in ORS 308.515(1)); ORS 308.510(4) (if property has an integrated use across businesses, and at least one business or service is enumerated in ORS 308.515, the department will exclude property that is not "primarily used" in the business or service enumerated in ORS 308.515); ORS 308.555 (allowing deduction for property located outside the state and not connected directly with the business. In this case, taxpayer makes no claim that the department has included property required to be excluded by statute.

of facilities, all property statewide, or a national or international territory in which the company operates. *See DISH Network*, 364 Or at 258 n 2 (department "not required to use unit assessment"); *see also Pacificorp Power Marketing v. Dept. of Rev.*, 17 OTR 334, 342 (2004) ("concept of a unit is a tool in valuation and, even then, is a concept the department has the choice to employ under ORS 308.555").

The department has adopted by rule its own standards for selecting the unit. This court has previously held that, when the department adopts rules in an area of discretionary authority, the rules "cabin" the department's discretion, such that the department may not "'act contrary to its rule.'" *ADC Kentrox I v. Dept. of Rev.*, 19 OTR 91, 96-97 (2006) (quoting *Resolution Trust Corp. v. Dept. of Rev.*, 13 OTR 276, 278 (1995)). In this case, the principal rule provides that the department "may consider a variety of facts to determine what property should be assessed as a unit." OAR 150-308-0660(3). These facts include, but are not limited to:

"(a)   Functional integration, determined by looking at the operation of the property used in the business at its highest and best use;

"(b)   Integration of management, administration, marketing, financing, use of employees and other resources of the business in which the property is used;

"(c)   Use of the property that contributes to the service or business listed in ORS 308.515;

"(d)   How both stock investors and investors acquiring all or a portion of the business assets or stock view investment in the property;"

*Id*. The rule also provides that the department may look to information contained in:

"(A)   Reports filed by publicly traded companies with the Securities and Exchange Commission;

"(B)   Filings with other governmental or nongovernmental agencies or organizations; and

"(C)   Other documents or materials used by the business in its service or sales."

OAR 150-308-0660(3)(A)-(C).

In addition, when valuing property as a unit,

"The department may include property used or held for future use by a parent company, holding company, subsidiary, or any other type of legal entity, including but not limited to partnerships, LLCs or joint ventures, when the department determines that the property of such business is operationally or financially integrated without regard to the physical location of the property, whether within or without the United States."

OAR 150-308-0660(4)(a).

The WSATA Handbook, adopted by reference as an administrative rule pursuant to OAR 150-308-0690,[52] states:

"In defining the unit, the appraiser should be guided by any existing statute or controlling case law in the state. However, as a general guideline, the appraiser should recognize that 'under the unit concept, the market value of the unit includes the synergistic value of all properties which compromise the unit. This includes all assets owned, used, and/or leased by a Firm and needed in the operation of its business.'"

WSATA Handbook at I-10 (quoting National Conference of Unit Valuation States, *Public Utility Appraisal Standards*, Standard I. B. (October 2005)).

WSATA bases its composition of the unit on the premise that "all functionally related operating property contributing to the operating cash flows of the firm would be transferred upon the sale of the property." WSATA Handbook at I-11. "In order to include out-of-state property in the appraisal unit, the appraiser must demonstrate that it is an integral part of the interstate system and logically adds to the value of the intrastate unitary property." *Id*. at I-12. The WSATA Handbook provides that the "specific criteria the appraiser should use to determine the appraisal unit include but are not limited to the following:

---

[52] *See* OAR 150-308-0660(1) ("Determination of the proper unit of property to be valued is a question of fact to be decided by the appraiser under rules adopted pursuant to 308.655 and the guidelines in the WSATA Handbook, adopted in OAR 150-308-0690.").

"a)   The unit with the most reliable audited financial statements looks at economic integration which considers such things as centralized management, marketing, financing, whether the same employees are working for both companies, and control of intellectual property.

"b)   The nature of the property or how it is physically integrated.

"c)   The manner in which the property is used. The use and management is often found by looking at functional, physical, and economic integration. Functional integration should be determined by looking at the operation of the property at its highest and best use. Economic integration is most closely aligned with the concept of market value and the highest and best use.

"d)   The permissible and most probable use of the properties.

"e)   The ownership and control of the properties.

"f)   The manner in which the properties might be sold.

"g)   The extent of the assessing body's jurisdiction."

*Id.* at I-10 - 11.

The department's expert Eyre testified that he chose to appraise a unit comprising taxpayer's entire worldwide property because (1) a complete set of audited financial statements (10Ks) existed for that grouping of property, including notes containing detailed explanations of how overhead costs were allocated among subsidiaries; (2) the 10Ks stated that taxpayer's property is physically and economically integrated as a worldwide unit; and (3) the 10Ks indicated that the property worldwide is controlled (as well as owned) "centrally." On cross-examination, Eyre acknowledged that financial information regarding only the North American properties was available as well, but he testified that he preferred to use the 10Ks because he was "very concerned about certain aspect[s] of what was on that North American financial statement." The court finds that Eyre applied factors described in the department's rules, including the WSATA Handbook, in determining the unit to value for tax year 2014-15.

Taxpayer's rebuttal witness Reilly testified to the effect that the financial information available on the North American unit was incorporated into, and thus as reliable as, the information in the 10Ks. Reilly also testified that Eyre should have selected the North American unit as the smallest unit for which reliable information was available. Reilly cited no authority requiring use of the smallest unit, but expressed his professional opinion that selection of the smallest unit would filter out the "noise" of higher growth rates for other portions of the company operating in areas of less competition, as well as currency and political risks. However, taxpayer does not assert that the department's use of the international unit for tax year 2014-15 was an abuse of discretion, and the court finds that there was none.

Rather, taxpayer argues that two provisions of Oregon law prohibited the department from changing its determination of the unit after finalizing the roll for that year.[53] Taxpayer first asserts that the department's reliance on the international unit at trial violated ORS 308.595. That statute provides:

> "The Director of the Department of Revenue, *while reviewing and apportioning the tentative assessment roll*, may not increase the valuation of any property on the roll without giving to the company or person in whose name the property is assessed at least six days' written notice to appear and show cause, if any, why the valuation of the assessable property of the company or person, or some part thereof, to be specified in the notice, should not be increased. *A notice is not necessary if the person or company appears voluntarily before the director and is notified by the director that the property of the person or company, or some specified part thereof is, in the opinion of the director, assessed below its assessed value*."

ORS 308.595 (emphases added). That statute, by its terms, applies during the time the department's director "reviews" the "tentative" assessment roll and apportions the value of all centrally assessed property to each county assessor.

---

[53] Taxpayer describes the use of the international unit as "arbitrary," but the court understands this argument to refer to the department's decision to switch to a different unit after the assessment was final, rather than as a criticism of the substantive decision of how the unit should be defined.

The statutory context shows that these are terms of art. No later than May 25 of each year, the department is required to mail a "notice of tentative assessment" to each centrally assessed taxpayer. ORS 308.582(1). No later than June 15, three things must happen: (1) the department must deliver the entire "tentative assessment roll" of all centrally assessed properties to the director for examination (*see* ORS 308.585); (2) the director must then "review the tentative assessment roll" to correct valuation and apportionment errors (ORS 308.580(1)(a)); and (3) a taxpayer must file any request for a conference with the director to discuss a reduction or change in apportionment (ORS 308.584(2)). During the next six weeks, the director must hold a conference if timely requested, but in any event the director must make any correction and certify the roll to each county assessor as final no later than August 1. ORS 308.584(3), ORS 308.600; *see* ORS 308.621(2).[54]

The "tentative assessment roll" is therefore a transitory record that presumably exists to facilitate communications and early resolution of disputes between the department and centrally assessed taxpayers. Because ORS 308.595 waives the six-day notice requirement if the centrally assessed taxpayer has already received notice of the increase in an appearance before the director, the apparent purpose of the notice is to give notice of an increase to taxpayers that have *not* filed a request for a director conference. When the director has certified the final roll, the local assessors are authorized to levy and collect taxes, and the tentative roll has no further significance. Likewise, the six-day notice requirement in ORS 308.595 applies only during the six-week director review period from June 15 to August 1, and only if the director increases the property valuation as between the tentative assessment roll and the final assessment roll. Taxpayer does not argue that the department made such an increase; rather, taxpayer's complaint is that the department increased its valuation long after the roll

---

[54] This compressed annual cycle for preparation, review, adjustment and certification of the central assessment roll reflects the unrelenting annual deadline for local assessors to get bills into the hands of property owners no later than October 25 for payment by November 15. *See generally Multnomah County Assessor v. Portland Devel. Comm.*, 20 OTR 395, 396-97 (2011).

was final. The court rejects taxpayer's argument because ORS 308.595 did not apply to the department's choice to substitute a new unit shortly before trial.

Taxpayer next argues that the department's use of the international unit, and corresponding increase in RMV, was a procedurally defective attempt to assess omitted property.[55] Taxpayer is in error on a fundamental point, however. The omitted property statutes apply only if the director determines that centrally assessable property "has not been *assessed on the assessment roll*" for a particular tax year. ORS 308.628(1) (emphasis added). The assessment roll lists or describes only "property that has a situs in this state." *See* ORS 308.515(1). Neither party in this case asserts that the department seeks to add Oregon-situs property to that list or description, as might happen, for example, if the department had discovered Oregon real property that a taxpayer had failed to disclose on its annual centrally assessed property tax return. *See* ORS 308.520(1).[56] Rather, Eyre, the department's appraiser engaged for purposes of this litigation, has opined that the correct value of the Oregon-situs property *already* on the roll was approximately double the value that the department's personnel had recorded on the roll. To be sure, Eyre reached that conclusion by *valuing* a dramatically larger unit that includes property outside North America, in many foreign countries and beneath international waters, and the department's staff apparently had not previously *valued* any of that property outside North America. As in other circumstances, however, "valuation" is only part of the process of "assessment." For locally assessed real property, the county assessor must painstakingly compile records and engage in background research to complete the tax roll. *See Gray v. Dept. of Rev.* 23 OTR 220, 230-31 (2018) (describing steps involved in local assessment). For centrally assessed property, the requirements for preparation of the roll are

---

[55] The omitted property statutes specific to centrally assessed property generally provide the only way the department may add property to the roll after the roll is final. *See* ORS 308.628 to 308.636.

[56] The department's administrative rules refer to the annual "statement" required by ORS 308.520 as a "return." *See, e.g.*, OAR 150-308-0480. For an example of a current-year return, see https://www.oregon.gov/DOR/forms/FormsPubs/utility-large-communication_302-131.pdf.

different, but the department still must describe the Oregon property at least generally, and determine whether any of the Oregon property is specifically required to be locally assessed or is subject to certain exemptions from tax. *See, e.g.*, ORS 308.560(1) (contents of roll); ORS 308.516 (exceptions to central assessment); ORS 308.677 (2017) (exemption for certain broadband property). One of the main reasons Oregon adopted central assessment in 1909 was precisely to allow the department to use the value of property within *and without* the state, multiplied by an Oregon allocation percentage determined by formula, to estimate the value of the property sitused in Oregon. *See* Or Laws 1909, ch 218. But that does not mean that Oregon "assesses" property sitused outside the state. The omitted property statutes do not apply to the department's expansion of the unit that it values under ORS 308.555.

It remains to be noted that there is nothing improper (or even particularly unusual in this case, except perhaps the magnitude of the increase) about the department's choice to argue a higher value at trial than it entered on the assessment roll. ORS 305.425(1) requires this court to provide a *de novo* adjudication of the value of property, and the parties are not constrained by their positions in prior proceedings—much less is any party or the court bound by the value on the roll. *Mid Oil Co. v. Dept. of Rev.*, 297 Or 583, 686 P2d 1020 (1984); *Clark v. Dept. of Rev.*, 14 OTR 221 (1997). The requirement in this court to exchange appraisal information in advance of trial mitigates somewhat the effect of the notorious Oregon rule of "trial by ambush"; a party that believes it would benefit from receiving its opponent's materials earlier than the typical 30 days before trial may consider asking the court to subject both parties to an earlier exchange date as a matter of case management. *See* Tax Court Rule 56 B(4).

Taxpayer's valuation evidence for tax year 2014-15 was premised on the same legal positions that the court rejects above for tax years 2015-16 and 2016-17. The department's appraiser applied the same methods for tax year 2014-15 that the court generally approved for tax years 2015-16 and 2016-17. The only new difference in approach separating tax year 2014-15 from the two later years is

the selection of the unit. Taxpayer has not shown that the department deviated from the criteria in the department's rules, and the court does not accept taxpayer's legal arguments against use of the international unit. Accordingly, the court sustains Eyre's conclusions that the RMVs for tax year 2014-15 are as shown below:

| Court's Conclusions of RMV for 2014-15 | | |
|---|---|---|
| Tax Year | System | Oregon |
| 2014-15 | $12,150,000,000 | $127,575,000 |

## V. CONCLUSION

Now, therefore, IT IS THE OPINION OF THIS COURT that the real market values are as listed below:

| Court's Conclusions of RMV | | |
|---|---|---|
| Tax Year | System | Oregon |
| 2014-15 | $12,150,000,000 | $127,575,000 |
| 2015-16 | $16,650,000,000 | $184,815,000 |
| 2016-17 | $19,150,000,000 | $224,055,000 |